UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-CR-80030-DIMITROULEAS/MATTHEWMAN

UNITED STATES OF AMERICA

v.

BLACKSTONE LABS, LLC
_____/

**MOTION TO SUPPRESS SEARCH WARRANT EXECUTED ON FEBRUARY 16, 2017
BY BLACKSTONE LABS, LLC, WITH INCORPORATED MEMORANDUM OF LAW**

On February 16, 2017, the Food and Drug Administration executed a search and seizure warrant at the premises of Blackstone Labs, LLC. The warrant was vague and overly broad, resulting in the unwarranted and illegal seizure of more than $1 million worth of nutritional supplement products as well as computerized documents and information, many pages of company business documents, and $223,430.40 from the company bank account. The government's unlawful seizure was an economic disaster for Blackstone's successful dietary supplement business. The seizure provides a textbook example of the importance of the Fourth Amendment's particularity requirement. Defendant Blackstone Labs, LLC moves to suppress evidence seized from its principal place of business on February 16, 2017, under Federal Rules of Criminal Procedure 12(b)(3)(C) and 41(h).

    **I.       PROCEDURAL POSTURE.**

1.     United States Magistrate Judge William Matthewman issued two Search Warrants based upon an Application for a Search Warrant requested by the Food and Drug Administration (FDA).

2.     The Affidavit submitted by the Food and Drug Administration (FDA) in support of the subject search and seizure warrant only alleged the existence of twelve adulterated or misbranded dietary supplement products. [Ex. A, Aff. at 4 ¶ 8]. However, the issuing warrant did not list or identify any products for seizure. [Ex. B, Attachment B.1 at 1-2].

3.      As a consequence, the government seizure of $1 million of nutritional supplements included 32 nutritional supplements unconnected to any alleged violation of Sections 331(a), 331(d), 331(v), and 333(a) of the Food, Drug and Cosmetic Act, much less the federal mail fraud, wire fraud, or conspiracy to commit mail and wire fraud statutes [Ex. C, Inventory of Items Seized at 5-7]. The seizure was an economic disaster for Blackstone.

4.      The Government also seized and imaged 13 computer and phone hard drives, rummaged through and copied all of Blackstone's business records, and took several computers for further forensic examination.

5.      Before the return of this indictment, Blackstone Labs filed a motion for the return of 21 nutritional supplements that were neither contraband nor an integral part of the government investigation. The government opposition memorandum conceded that its basis for the continued seizure of Blackstone's product extended beyond the criminal allegations contained in the search warrant affidavit. There is accordingly a genuine question as to whether the government knew it seized material not connected to the allegations in the search warrant.

## II.     MEMORANDUM OF LAW.

6.      The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also Carpenter v. United States*, 138 S. Ct. 2206 (2018) ("[The] basic purpose of this Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."). The purpose of the Fourth Amendment warrant clause is

2

to ensure that those searches deemed necessary should be as limited as possible. *Riley v. California*, 573 U.S. 373, 403 (2014).

7.      The founding generation crafted the Fourth Amendment as a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California,* 573 U.S. 373, 403 (2014). Thus, the Fourth Amendment limits law enforcement's rights to search only "the specific areas and things for which there is probable cause to search," requiring "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

### A.      Lack of Particularity and Overbreadth.

8.      Particularity is the requirement that the warrant must clearly state what is sought. *United States v. Barnes*, 749 F. Supp. 2d 1124, 1131 (D. Idaho 2010). The description of the property to be seized must enable the officers or agents executing the warrant to ascertain and identify property with reasonable certainty. *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982); *United States v. Beckett*, 544 F. Supp. 2d 1346, 1350 (S.D. Fla. 2008), *aff'd,* 369 F. App'x 52 (11th Cir. 2010). Particularity is important when the government seeks to seize product that could otherwise be sold to customers. An indiscriminate warrant that authorizes the seizure of all products as well as the seizure of business funds in a bank account can shut down a business, leaving the business defenseless.

9.      "[A] warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *United States v. Galpin*, 720 F.3d 436,

446 (2d Cir. 2013)). Warrants must specify the items to be seized by their relation to designated crimes. *United States v. Wey*, 2017 U.S. Dist. LEXIS 91138 at *60-61 (S.D.N.Y. June 13, 2017) (citing *United States v. Buck*, 813 F.2d 588, 590–92 (2d Cir. 1987) (warrant authorizing seizure of any papers, things or property of any kind relating to [the] previously described crime was overbroad)).

10.     Nor does a conclusory reference to a broad set of federal statutes render the warrant sufficiently narrow. *United States v. Leary*, 846 F.2d 592, 601 (10th Cir. 1988). Courts have held that warrants that identify catchall statutory provisions, like the mail fraud or conspiracy statutes, may fail to comply with the particularization requirement. *Galpin*, 720 F.3d at 445; *see, e.g.*, *Leary*, 846 F.2d at 594 (warrant authorizing search of export company's business records for violation of the Arms Export Control Act, 22 U.S.C. § 2778, and the Export Administration Act of 1979, 50 App. U.S.C. § 2410, held overbroad)); *Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985) (warrant specifying 18 U.S.C. § 371 held overbroad and warrants invalidated); *United States v. Roche*, 614 F.2d 6, 8 (1st Cir. 1980) ("a limitation of a search to evidence relating to 18 U.S.C. § 1341, the general mail fraud statute, provides no limitation at all").

11.     The officers or agents carrying out the warrant are required to interpret the warrant, but they are not obligated to narrowly interpret the warrant. *Id.* (citing *United States v. Stiver*, 9 F.3d 298, 302–03 (3d Cir. 1993) (holding a general requirement of reasonableness is informed by the goals of preventing undue invasions of privacy). This is why nothing should be left to the discretion of the officer executing the warrant. *See Marron v. United States*, 275 U.S. 192, 196 (1927).

12.    The Warrant to conduct an unrestrained exploratory search of Blackstone's facilities lacked any particularity, was overbroad, was based on stale and unreliable information, and failed to provide a nexus between the alleged crimes and things to be seized.

> **1.    Lack of Particularity and Overbreadth as to Products Unlawfully Seized.**

13.    The Blackstone Warrant does not identify a single Blackstone product by name, ingredient, chemical composition, or formula. The absence of *any* particularity in the Blackstone Warrant renders the Warrant facially unconstitutional. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

14.    While the McCoy Affidavit specifically identifies twelve products, none of them were incorporated by reference into the Search Warrant. *Id.* at 554–555 (holding lack of particularity where warrant did not incorporate by reference itemized list contained in the application rendered warrant unconstitutional).[1]

15.    The Fourth Amendment "requires particularity in the *warrant*, not the supporting documents," and accordingly, "the fact that the warrant application adequately described the 'things to be seized' does not save the warrant" from failure to satisfy the requirement. *Wuagneux*, 683 F.2d at 1349 (citing *Groh*, 540 U.S. 551). When an itemized list of things to be seized is general, the warrant must contain an attached supporting affidavit to link the things to be seized to the alleged crimes. *United States v. Wey*, 256 F. Supp. 3d 355, 385–86 (S.D.N.Y. 2017). The failure to connect otherwise legal property to alleged crimes provides no practical guidelines or tools for agents to execute a warrant in good faith and reasonably ascertain things to be seized. *Wey*, 256 F. Supp. 3d at 355. Thus, the *Wey Court* held invalid a search warrant because it lacked enough

---

[1]Specifically, the substances identified in the affidavit were: "(A) Super DMZ Rx 2.0; (B) Angel Dust; (C) Cobra 6P Extreme; (D) Dust V2; (E) Brutal 4ce; (f) Dust Extreme; (G) Ostapro; (H) Growth; (I) Anesthetized; (J) Euphoria; (K) Gear Support; and (L) PCTV." [Aff. at 4 ¶ 8].

particularity. It did not contain a specific linkage between the material items and the crime therein, and the agents thus could not distinguish "meaningfully between materials of potential evidentiary value and those obviously devoid of it." *Id.*

> **2.    *Lack of Particularity and Overbreadth as to Business Records Unlawfully Seized.***

16.    Warrants must "specify the items to be seized by their relation to designated crimes." *United States v. Wey*, 2017 U.S. Dist. LEXIS 91138 at *60-61 (S.D.N.Y. June 13, 2017) (citing *Buck*, 813 F.2d at 590–92 (warrant authorizing seizure of "any papers, things or property of any kind relating to [the] previously described crime" was overbroad)). Nor does a conclusory reference to a broad set of federal statutes create the narrowness sufficient to ward off concerns of overbreadth. *Leary*, 846 F.2d at 601.

17.    A warrant that identifies "generic" or "catch-all" categories of items subject to seizure without any linkage to the suspected criminal activities may be invalidated for overbreadth. *Wey*, 2017 U.S. Dist. LEXIS 91138 at *72-73 (S.D.N.Y. June 13, 2017); *accord United States v. Hunter*, 13 F. Supp. 2d 574, 584 (D. Vt. 1998) (finding warrant authorizing seizure of "[a]all computers … [a]ll computer storage devices … [and a]ll computer software systems," "is a catch-all paragraph, which lacks sufficient limitation"); *United States v. Griffith*, 867 F.3d 1265, 1276 (D.C. Cir. 2017) ("Yet the warrant did not stop with any devices owned by Griffith, which already would have gone too far. It broadly authorized seizure of *all* cell phones and electronic devices, without regard to ownership.").

18.    The type of property that is "generally in lawful use in substantial quantities" requires "greater care in its description" in a warrant. *Id.* at 73. Specifically, where warrants authorize "virtually a wholesale search and seizure of the business records of the" business, the warrants are "constitutionally infirm" and must be invalidated. *Klitzman, Klitzman & Gallagher*

6

*v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984) (invalidating warrants executed on a law firm that "allowed the seizure of all" business records "without regard to whether the materials had any connection to particular alleged crimes").

19.     Both the Warrant and the McCoy Affidavit state that documents and information to be seized include "all records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug and Cosmetic Act." Both the Affidavit and the Warrant contain identical citations to references to federal statutes." [Aff. 3 ¶ 4]; [Warrants 1 ¶ 1].

20.     The Blackstone Warrant called for the seizure of 11 categories of information [Warrant at 1-2 ¶1a-k], equating to essentially the entirety of Blackstone business records and inventory with no limitation on the product or products of concern.

21.     The execution of the Blackstone Warrant with this overbroad, catch-all category of documents gave the agents unchecked discretion in searching for any communications, representations, or documents concerning "[a]ll records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug and Cosmetic Act." Such overbreadth permitted the agents to rummage through all of Blackstone's day-to-day operations. In the end, upon information and belief, the government seized, imaged and copied the entirety of the company's electronic and physical records, including voluminous attorney-client privileged materials. Notably, the government has provided neither a privilege log of any seized materials, nor any disclosure of any taint team review.[2]

---

[2] Of particular note is an "[e]vidence bag containing 3 manila folders with potential attorney-client documents. The government has not provided a single privilege log over the course of its 18 discovery productions in this matter, nor identified what these folders are or purport to contain.

22.     The agents seized an additional 32 products during their ten-hour exploratory search of Blackstone's facility. The affidavit avers that government agents engaged in a series of controlled buys prior to the raid, but not *one* of the additional 32 seized products was ordered and tested in advance of the search and seizure at issue in this case.[3]

23.     Additionally, review of the inventory of business records shows the agents engaged in similar exploratory rummaging of files, as the seizure included such unparticularized items as Checkers receipts (Ex. C, at 1).

24.     The lack of any particularity in the Warrant as it related to Blackstone's business records, when coupled with the agent's actual unfettered discretion in what records to seize, renders the Warrant unconstitutional.

### 3.     *Lack of Particularity and Overbreadth as to Electronic Records Unlawfully Seized.*

25.     The principles set forth above are equally applicable to search warrants for the seizure of electronic data. *See, e.g.*, *In re Search of premises known as: Three Hotmail Email accounts*, 2016 U.S. Dist. LEXIS 40545 (D. Kan. Mar. 28, 2016) (denying application for search warrants for email accounts and all associated [electronically stored information] due to failure to state particularity); *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) (lack of temporal limitation on search warrants for Facebook accounts created unnecessary intrusion); *Wey*, 2017 U.S. Dist. LEXIS 91138 (invalidating warrants for email accounts when the warrants lacked any temporal limitation on the emails to be seized).

26.     The government's lack of particularity in a search of electronic media granted the agents a virtually unlimited look into every aspect of every Blackstone employee's life. *Riley v.*

---

[3] McCoy eventually informs the magistrate that she has not provided a complete list of all products labeled as dietary supplements thirty-two pages into her Affidavit. [Aff. 32 ¶ 116].

*California*, 134 S. Ct. 2473, 2489 (2014) ("The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions . . . ."). Heightened sensitivity to the particularity requirement in the context of electronic searches is therefore required. *Galpin*, 720 F.3d at 447.

27.     Further, the seizure of all business records for evidence of mail or wire fraud, as drafted and in execution in this matter, encompassed every single item and piece of electronic information contained within Blackstone's warehouse. The failure of the McCoy affidavit to provide any limitation on the search of electronic devices found in the Blackstone facilities resulted in a general warrant to rummage through Blackstone's files looking for evidence of some crime.

28.     Based on the vague and unspecified crimes stated on the face of the warrants, the agent executing the warrants did not have any basis for eliminating any document related to any business activity of Blackstone. On these grounds, the Blackstone Warrant as it related to the seizure of electronic information is unconstitutional.

29.     For these reasons, the Warrant and all evidence seized from it should be suppressed.

   **B.     The McCoy Affidavit Contained Unsubstantiated and Unreliable Information.**

30.     "[An] affidavit may be based on personal observations of the affiant, or hearsay, or a combination thereof," *United States v. Flanagan*, 423 F.2d 745, 747 (5th Cir. 1970), "an affidavit containing 'inherently defective hearsay on hearsay' (that is, hearsay on hearsay as to which there is absent any indication of the reliability of the anonymous hearsay source) can withstand attack only if the supporting circumstances related therein are sufficient in themselves to establish probable cause." *United States v. Roth*, 391 F.2d 507, 511 (7th Cir. 1967) (citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965) ("[H]earsay may be the basis for issuance of the warrant 'so long as there. . . [is] a substantial basis for crediting the hearsay."). "In addition, if the affiant relies

on conclusions drawn by [an] informer, he must relate the circumstances upon which the informer based his conclusions. Otherwise the inferences drawn from the facts are not drawn by a neutral and detached magistrate, as the Fourth Amendment requires." *Flanagan*, 432 F.2d at 747.

31.     The McCoy Affidavit relies on use of the "Wayback Machine" to access previous versions of Blackstone's consumer website and other third-party websites. This information is inherently unreliable as "the Wayback Machine site itself includes a disclaimer that the Internet Archive 'makes no warranty or representation regarding the accuracy. . . of the content.'" *Nassar v. Nassar*, No. 3:14-CV-1501-J-34MCR, 2017 WL 26859, at *5 (M.D. Fla. Jan. 3, 2017), *aff'd,* 708 F. App'x 615 (11th Cir. 2017) (refusing to take notice of Wayback Machine printout); *accord United States v. Bansal*, 663 F.3d 634, 667–68 (3d Cir. 2011); *Novak v. Tucows, Inc.*, No. 06CV1909(JFB)(ARL), 2007 WL 922306, at *5 (E.D.N.Y. Mar. 26, 2007), *aff'd,* 330 F. App'x 204 (2d Cir. 2009).

32.     An affidavit containing "inherently defective hearsay on hearsay" (that is, hearsay on hearsay as to which there is absent any indication of the reliability of the anonymous hearsay source) can withstand attack only if the supporting circumstances related therein are sufficient in themselves to establish probable cause." *Roth*, 391 F.2d at 511. No such evidence concerning the reliability of the Wayback Machine was provided to the Magistrate, requiring suppression of the Warrant.

### C.     The Good Faith Exception Does Not Apply Because McCoy's Affidavit Contained Misleading Information.

33.     Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The exclusionary rule, as it is known, is "a judicially created remedy designed to safeguard Fourth

Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974). One exception to this exclusionary rule is the *Leon* good faith exception.

34.      Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and the Supreme Court had concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination. *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983); *Ventresca*, 380 U.S. at 108–109. Thus, for public policy reasons, the *Leon* Court held that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause, as to do so would not contribute retroactively to deter police misconduct. *Id.*

35.      The *Leon* good faith exception applies in all but four limited sets of circumstances: "(1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in"; (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 914 (internal citations omitted).

36.      The first category of exceptions to the *Leon* good faith exception to the exclusionary rule applies to Affidavits where: "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except

11

for his reckless disregard of the truth." *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002) (citing *Leon*, 468 U.S. at 992).

37.     McCoy misled the Magistrate on two factual issues: first, on the Mira Health Super DMZ voluntary recall of Super DMZ; second, on the nature of the labels pulled from the VenTech trash pulls.

38.     First, McCoy alleged that 'In July 2013, the *Blackstone product* "Super DMZ Rx 2.0" was part of a *voluntary* recall by its manufacturer, Mira Health Products, Ltd. Specifically, McCoy alleged that the FDA directed Mira Health to recall its product in 2013 [Aff. 12-13 ¶ 41-42], but she omitted that Blackstone was not given notice of this directed recall. McCoy failed to explain that the *only* regulatory guidance Blackstone had ever received was over a warning letter over an ingredient called AMP Citrate, which she briefly mentions in connection with a later product. [Aff. 14-16 ¶¶49-53]. Thus, the suggestion that Mira Health's generic Super DMZ RX 2.0 recall encompassed Blackstone Labs' version of the product was misleading. [Aff. 13 ¶ 43].

39.     Second, McCoy details obtained labels and product purported to contain or be Blackstone Labs Super DMZ 2.0.

40.     McCoy misleadingly suggested that the recalled Mira Health product was the same as the Blackstone Labs' product [Aff. 14 ¶ 43] despite later explaining that the controlled buy from Legendary Supplements and the blank, unprinted, and unattached labels found in the VBS dumpster contained different lot numbers, colored ink expiration dates [Aff. 14 ¶ 4]. McCoy should have explained to the Magistrate that the lot numbers also tracked the manufacturer of the product, so the fact that the numbers did not match meant that they were not manufactured by the same entity. *See* 21 CFR 201.3 ("Batch number, lot number, or control number means any distinctive group of letters, numbers, or symbols, or any combination of them, *from which the complete*

*history of the manufacturing*, packaging, labeling, and/or holding of a batch or lot of dietary supplements can be determined."). *See also* 21 C.F.R. 111.255 (detailing requirement of lot and batch controls requirements for manufacture of dietary supplements.).

41.     These misrepresentations led the Magistrate into believing that the blank unprinted labels found in the trash at VenTech labs were one and the same from a previous recall and controlled buy from another third party.

### D.     The Warrants Were Supported by Stale Evidence.

42.     In determining whether probable cause exists, the Magistrate is required to assess whether the information set out in the application appears to be current, i.e., true at the time of the application, or whether it instead has become stale. *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994), *holding modified by United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998) ("For probable cause to exist, however, the information supporting of the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant."); *accord Harris*, 20 F.3d at 450 (same). To establish probable cause, the government must show that it is "likely that the items being sought are in that place when the warrant issues." *Harris*, 20 F.3d at 450. "Warrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing." *Id.; see also Reyes*, 922 F. Supp. at 826; *United States v. Latimore*, 2014 U.S. Dist. LEXIS 91777, at *90 (N.D. Ga. May 29, 2014) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.") (citing *Sgro v. United States*, 287 U.S. 206, 210 (1932)).

43.     "There is no mathematical measure for when freshness fades away and staleness sets in." *United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011). While there is no bright

line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and execution of the subsequent search so that probable cause can be said to exist as of the time of the search and not simply as of sometime in the past. *United States v. Wagner*, 989 F.2d 69, 75 (2d. Cir. 1990) (finding evidence that a defendant was a member of a drug conspiracy was stale when warrant certified a single drug purchase six weeks prior to the search); *United States v. Harmon*, 2006 U.S. Dist. LEXIS 95196, at *40-41 (E.D. Tenn. Apr. 12, 2006) (finding search warrant partially invalid because it was based on activities that occurred nearly three years prior to the warrant's issuance); *Reyes*, 922 F. Supp. at 826 (information supporting a finding of probable cause should be no older than one year); *United States v. Murray*, 2014 U.S. Dist. LEXIS 77341, at *17 (N.D. Ga. Apr. 14, 2014) (affidavit in support of search warrant detailing investigation a year prior to search warrant's issuance would render warrant stale).

44.     Information in both warrant applications is stale. Not one factual statement ties Blackstone to an allegation of a crime that is "so closely related" to the time of the warrant issuance that a finding of probable cause is justified. *Latimore*, 2014 U.S. Dist. LEXIS 91777 at *90. The most recent information specifically tied to *Blackstone* is dated October 2016, four months prior to the issuance of the Blackstone Warrant. [Aff. 31 ¶ 115].

45.     The staleness of the Warrant is apparent when each product is considered in temporal connection to its most recent alleged act. Additionally, the McCoy Affidavit provided the Magistrate with the dates of overt acts connected to *half* of the identified products:

| **Product** | **Most Recent Alleged Act** | **Temporal Relation to Warrant** |
| --- | --- | --- |
| 1. Super DMZ RX 2.0 | October 2016 [Aff. 31 ¶ 115] | Four Months |
| 2. Angel Dust | April 2015 [Aff. 15 ¶ 53] | One Year Ten Months |

| 3. Cobra 6P Extreme | February 2016 [Aff. 17 ¶ 61] | One Year |
| 4. Dust V2 | February 2016 [Aff. 18 ¶ 65] | One Year |
| 5. Brutal 4ce | *None*] | *None* |
| 6. Dust Extreme | June 2016 [Aff. 26 ¶ 93] | Eight Months |
| 7. Ostapro | October 2016 [Aff. 24 ¶ 86 referencing Aff. 31 ¶ 115] | Four Months |
| 8. Growth | *None* | *None* |
| 9. Anesthetized | *None* | *None* |
| 10. Euphoria | *None* | *None* |
| 11. Gear Support | *None* | *None* |
| 12. PCTV | *None* | *None* |

46.     The Affidavit does not allege that the crimes here are pervasive, long running, or protracted. Nor does it provide any corroborating evidence to update or refresh the information in the affidavits. The government did not state any specific proof that the alleged crime was still ongoing at the time they executed the warrants, nor that the alleged contraband would even still exist at the time of execution. The connection between the facts alleged between: (1) a handful of misleading and stale website page captures; (2) a series of controlled buys and trash raids occurring months before the execution of the Warrant; (3) and the execution of the warrants in February 2017 is simply too attenuated to support probable cause.

47.     For these reasons, the Warrant and all evidence unlawfully seized from it should be suppressed.

**E.     The Government's Execution of the Search Warrants Was Reckless and Likely Resulted in the Review of Privileged Information by the Investigatory Teams.**

48.     McCoy states that Blackstone had been working with counsel known to the FDA regarding previous regulatory matters with the FDA since 2015. [Aff. 15 ¶ 53].

49.     On information and belief, the government, despite this knowledge, failed to create or implement any mechanisms that would protect and preserve the attorney-client privilege and attorney work product privilege during its search of the Blackstone's computers. This reckless

disregard for these privileges led the government to obtain and review voluminous privileged documents and communications. Accordingly, the fruits of the searches should be suppressed.

50.     The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Documents reflecting attorney-client communications are entitled to special protection under the Fourth Amendment because of the "intrinsic high expectation of privacy" such documents enjoy. *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (quoting *OKC Corp. v. Williams*, 461 F. Supp. 540, 542 (N.D. Tex. 1978)). Documents within the scope of the attorney-client privilege are "zealously protected." § 2017 Privileged Matter—Attorney–Client Privilege, 8 Fed. Prac. & Proc. Civ. § 2017 (3d ed.); *see Chore-Time Equip., Inc. v. Big Dutchman, Inc.*, 255 F. Supp. 1020, 1021 (W.D. Mich. 1966) ("It generally is acknowledged that the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously.").

51.     A "purposeful intrusion" into the attorney-client relationship creates a presumption that there has been a "prejudicial effect on the reliability" of the litigation process. *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995); *see also United States v. Orman*, 417 F. Supp. 1126, 1133 (D. Colo. 1976) (holding that when a party accesses attorney-client protected documents, a "strong presumption" exists that the review of the protected information "causes incurable prejudice"). Such a presumption is justified because "no other standard can adequately deter this sort of misconduct," and "prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Shillinger*, 70 F.3d 1132.

52.     After its seizure of every electronic document at the Blackstone facility, the government took the opportunity to have an unmonitored rummage through the tens of thousands

16

of emails seized, without any regard for the privileged nature of the documents. Further, the government seized paper records that it knew or should have known were attorney-client privileged as identified in the Search Warrant Inventory.

53.     This demonstrates reckless disregard for, if not a blatant violation of, the Sixth Amendment.

54.     At the time of the seizures, there could have been no doubt in the minds of the government agents that the accounts – unrestricted by search terms or other limiters – would contain privileged communications.

55.     A search term analysis of portions of the documents seized from Blackstone and reproduced by the government reveals over 718 documents identified as "privileged with custodial concerns," that is, documents identified as attorney-client privileged that the government unlawfully seized. It is unclear if the government used a taint team.[4]

---

[4] Due to the "sacred" nature of the privilege, and the severe consequences that result if the privilege is intentionally breached, the Department of Justice recommends that, when agents seize electronic information or storage that contains legally privileged files, "a trustworthy third party must examine the [storage] to determine which files contain privileged material." *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, Office of Legal Education Executive Office for United States Attorneys*, p. 109 ("Electronic Crimes Manual"). Based on the documents released to defendants as part of the government's Rule 16 discovery materials, this recommendation has not been followed.

While it is routine for the government to utilize a "taint team" to review the seized materials for privileged documents and communications, use of a taint team is not without its issues, in part because a government taint team's review of potentially privileged documents is, still, an intentional intrusion into the privilege. *Neill*, 952 F. Supp. at 840 (appeal from evidentiary hearing holding that the government "intentionally invaded the attorney-client privilege" when it reviewed materials it knew were protected but set up a "taint team" to review them). There is a presumption that privileged information will be passed to the prosecution team. *Id.* at 841. The government bears the burden to rebut the presumption that tainted material was disclosed. *Id.*

The government provided no details to Blackstone or its undersigned counsel about the composition of any taint team or its review to date – neither the makeup of the team nor the process for ensuring that the defendants' "sacred" privilege is maintained. The best course of action to protect the privilege is to allow the defense team an opportunity to object before the government

56.     However, it appears to be clear that the government took the opportunity to "purposeful[ly] intru[de]" into Blackstone's attorney-client relationships when it executed its general warrants. The only reasonable conclusion is that the government acted with open disregard for the "sacred" privilege.

57.     Intentional intrusion into the attorney-client relationship by the prosecution is "especially troubling." *United States v. Pedersen*, 2014 U.S. Dist. LEXIS 106227 at *82 (D. Ore. Aug. 4, 2014) (where prosecutors and members of the government filter team intentionally intercepted defendant's legal mail and other legal communications, judge found several deficiencies in prosecutors' actions and protocols). Such a laissez-faire approach to protect Defendants' Sixth Amendment Rights should not benefit the government.

58.     The appropriate remedy for such a wanton, pervasive intrusion into the privilege by the government is invalidation of the warrants. *Klitzman, Klitzman and Gallagher*, 744 F.2d at 960–62 (seizure of privileged documents caused irreparable harm to defendants and warrants ordered invalidated as a result). Egregious behavior on the part of the government without consequence erodes the public trust in the judicial system.

**III.    CONCLUSION.**

59.     The Warrant and supporting McCoy affidavit in this matter violated the Fourth Amendment rights of Blackstone Labs, as they were the predicate for a ten-hour exploratory search of a legitimate dietary supplement company's warehouse. The lack of particularity and specificity,

---

reviews any material obtained via the warrants. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019), *as amended* (Oct. 31, 2019) (holding error where Magistrate allowed taint team to review privileged materials unsupervised).

Accordingly, defendants request that the Court hold a hearing on the government's taint/privilege review process to ensure that proper procedures were, and continue to be, utilized to segregate and return privileged information, and confirm that no privileged documents have slipped through the cracks to the prosecution team.

and the overbreadth of the Warrant rendered the Warrant unconstitutionally vague, leaving the agents unfettered discretion in the execution of the Warrant. The inventory of products seized unquestionably confirms that unfettered discretion. Further, the unreliable, stale and often untruthful evidence McCoy averred to the Magistrate render the Warrant unlawful. Finally, the government's deliberate intrusion into the attorney-client privilege requires suppression of the Warrant and all unlawfully seized evidence.

60.     For these reasons, all items that were seized during the unlawful search and seizure of Blackstone Labs (identified in Exhibit C) must be suppressed.

## IV.     REQUEST FOR ORAL ARGUMENT.

61.     Blackstone asks for oral argument in this matter and any evidentiary hearing the Court deems just and proper.

## V.     CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9.

62.     Undersigned counsel has conferred with the government's attorneys, Alistair Reader, Trial Attorney, and David Frank, Senior Litigation Counsel, Consumer Protection Branch, United States Department of Justice. They object to the Court granting this Motion.

## VI.    CONCLUSION.

For these reasons, suppression should be ordered.

Respectfully submitted,

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**SUSAN DMITROVSKY**
Florida Bar No. 73296
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
mdavis@kuehnelaw.com
efiling@kuehnelaw.com
*Counsel for Blackstone and Braun*

*S/ Robert J. Buonauro*
**ROBERT J. BUONUARO, B.C.S.**
435 Canal Street, Suite 208
New Smyrna Beach, Fl 32168
Tel: 407-841-1940
Fax: 407-649-1936
Florida Bar No. 150756
robert@buonauro.com
*Counsel for David Winsauer*

*S/ Nancy Vorpe Quinlan*
**NANCY VORPE QUINLAN**
515 North Flagler Drive, Suite 701
West Palm Beach, Fl 33401
T: (561) 721-0552
F: (561) 329-9902
Florida Bar No. 593532
nquinlan@palmbeachdefense.com
*Counsel for Anthony Ventrella*

*S/ J. Stephen Salter*
**J. STEPHEN SALTER**
8975 Pompano Way
Gulf Shores, Al 36542
T: (205) 585-1776
umstakwit@aol.com
Pro Hac Vice Admitted
*Counsel for James Boccuzzi*

*S/ Robert L. Shearin*
**ROBERT L. SHEARIN**
1700 South Federal Highway, Ste 501
Boca Raton, Fl 33432
T: (561) 706-7572
F: (561) 429-2987
Rlshearin1@yahoo.com
Florida Bar No. 47759
*Counsel for Ventech Labs, LLC*

*S/ Richard G. Lubin*
**RICHARD G. LUBIN**
Fla. Bar No. 182249
**RICHARD G. LUBIN, P.A.**
707 North Flagler Drive
West Palm Beach, FL 33401
Tel: 561-655-2040
Fax: 561-655-2182
rich@lubinlaw.com
*Counsel for Aaron Singerman*

*S/ Amy Morse*
**AMY MORSE**
**MORSE & MORSE, LLC**
Of Counsel to Richard G. Lubin, P.A.
707 North Flagler Drive
West Palm Beach, FL 33401
T: (561) 651-4145;
F: (561) 655-2182
Email: amy@morselegal.com
Florida Bar No. 0388475
*Counsel for Aaron Singerman*

**CERTIFICATE OF SERVICE**

I CERTIFY that on January 31, 2020, I electronically filed the foregoing document with the

Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day

on all counsel of record either via transmission of Notices of Electronic Filing generated by

CM/ECF or in another authorized manner for those counsel or parties not authorized to receive

electronically Notices of Electronic Filing.

By:    _S/ Benedict P. Kuehne_
        **BENEDICT P. KUEHNE**