**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-80030-CR-Dimitrouleas/Matthewman**

**UNITED STATES OF AMERICA**

**vs.**

**PHILLIP BRAUN,**
**AARON SINGERMAN,**
**ANTHONY VENTRELLA,**
**DAVID WINSAUER**
**JAMES BOCCUZZI,**
**BLACKSTONE LABS, LLC, and**
**VENTECH LABS, LLC,**

       **Defendants.**
_____/

## GOVERNMENT'S RESPONSE TO MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT AND SANCTIONS, ECF NO. 228

The United States, by and through undersigned counsel, hereby respectfully submits its opposition to the defendants' Motion to Dismiss Indictment and Request for Sanctions, ECF No. 228.

The Court should deny the motion because the defendants fail to state a legitimate Brady claim, even while engaging in egregiously false and unsubstantiated accusations about the prosecution team's conduct.  In fact, the government has exceeded its discovery obligations and repeatedly sought out and produced information that might be potentially favorable to the defense. The defendants' motion is also falsely premised on a supposition that government experts opined that the anabolic steroids in question are not controlled substances when sold in violation of 21 U.S.C. § 802(41)(C).  In fact, government subject matter experts supported and continue to support the fact that the anabolic steroids in question meet the scientific definition in section 802(41)(C).

1

There is no misconduct where the documents in question were produced four months before trial, were not suppressed, are not actually exculpatory, and the defendants have suffered no actual prejudice.

Accordingly, the defendants' accusation that key "information was kept hidden from the defendants and even the Grand Jury" lacks substance and their requests for sanctions and dismissal must be denied.  See Mot. at 2.

## MATERIAL FACTS

The defendants' claims of misconduct are largely premised on documents produced in discovery in January 2020 from the Drug Enforcement Administration ("DEA").  The indictment alleges a conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841.  Three of the six anabolic steroids alleged in the indictment are not specifically listed in the Controlled Substances Act, 21 U.S.C. § 802(41)(A).  The government alleges those three substances were controlled substances because they meet the scientific and intent requirements in section 802(41)(C), an analogue drug provision enacted by the Designer Anabolic Steroid Control Act of 2014 ("DASCA") in December 2014.  As described in a 2018 affidavit for a search warrant, defendant Blackstone Labs, LLC's website specifically advertised their steroid-containing products as similar to other anabolic steroids.  McCoy Aff. ¶¶ 39, 42, 46, In re Search Warrant of jamesbocc@gmail.com, No. 18-6319-HUNT (S.D. Fla. July 12, 2018). For example, the product Super DMZ Rx 2.0, alleged to contain two unlisted anabolic steroids, was marketed as "engineered and designed to increase, sustain, and strengthen muscularity," because it "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol."  Id.  The website also depicted the chemical

structure of the product's active ingredients, and discussed at length how the substances were similar to other anabolic steroids.  E.g., Ex. 1 (depicting dimethazine and methylstenbolone).  The investigation leading to this indictment was conducted by the Food and Drug Administration ("FDA") Office of Criminal Investigations.

I.   Discovery

Starting in April 2019, the government produced broad and comprehensive discovery that has exceeded the requirements of Rule 16, Brady, Giglio, and the Jencks Act.  Along the way, the government provided detailed cover letters and tracked the discovery for defense counsel via a log.  See Ex. 2, Govt Discovery Log.  For example, the government collected extensive supplemental documents from the FDA, including work product, drafts and deliberative process materials, and produced the results under protective order.  The purpose of producing these FDA documents was not because they are the government's trial evidence, but was to exceed the government's discovery obligations.

The government produced more than 8,000 internal, FDA documents in searchable format.  Ex. 2, at p. 12, row 144, 166.  The government also produced more than 20 memoranda of interviews of defendants and their employees in May 2019, and another 22 memoranda of interviews of other witnesses in January 2020.  The government produced potential trial exhibits in June 2019, including specific documents for each count in the indictment and most of the overt acts referenced under conspiracy counts.  The government also took considerable effort and expense to provide defendants with copies of all electronic discovery, scans of paper documents, photographs of physical evidence, and forensic copies of electronic devices, including purchasing numerous encrypted hard drives to ensure that defense had easy access, and did not need to visit government facilities to review evidence.

On May 3, 2019, the Court set a discovery deadline for May 17, 2019, and the government produced almost all existing discovery by that date.  The documents that were produced after the deadline were newly found materials, a June 2019 expert disclosure, documents not covered by Rule 16 (e.g., grand jury transcripts and memoranda of interviews), technical corrections to prior productions, higher quality versions of previously produced images, or a small number of documents that had been omitted from prior productions.  For example, the government produced the 257 potential trial exhibits, of which only two documents were new.  <u>See</u> Govt Opp'n to Continuance, ECF No. 186, at 4-7 (providing detail on discovery productions).  The government also explained in its August 8, 2019, pleading:

> Supplemental productions would include the following: (1) FDA documents that were recently reviewed for privilege; (2) documents that the government acquires when one or more defendants plead guilty and produce additional documents; (3) ***Brady and Giglio materials identified by the government***.

ECF No. 186, at 7, n. 5 (emphasis added).  The Court held a hearing on a motion for continuance on August 12, 2019, and at the hearing, the government again addressed the remaining discovery.[1]  Consistent with the August 12, 2019 hearing and its continuing discovery obligations, the government subsequently produced the following documents:

- September 13, 2019
    - FDA documents specifically reviewed for privilege (discussed above)
    - Records provided by defendant Robert DiMaggio (discussed in footnote 1)
    - Extracted phone communications from a witness (49 documents)

---

[1] MR. READER: And I think the point I was trying to make, Your Honor, is that we -- in our opposition we mentioned that there are going to be more documents here. We have completed the documents that we have available, but there are a few more documents here and I want to make sure that everyone understands that and Your Honor understands that.

THE COURT: Get them out as soon as you can because if I become convinced that you've held back on documents that should have been disclosed and that the defendants are prejudiced by it, then I may exclude that testimony in the government's case in chief.

MR. READER: Very well, Your Honor. ***The documents in question are documents that were recently reviewed for privilege and found to be not privileged,*** a small group of documents involving the FDA, documents involving Mr. DiMaggio who you've heard about today, ***and any future Brady or Giglio documents that we identify***. There should be a very limited pool of documents.  Tr. Aug. 12, 2019, at 36-37 (emphasis added).

- o Extracted phone communications between Anthony Ventrella and Ashley Ventrella (defendants already possessed the full phone images, produced on May 3, 2019)
- November 20, 2019
  - o Robert DiMaggio plea agreement (filed on November 19, 2019)
- November 26, 2019: Technical corrections
  - o Technical correction, images from search warrant of James Boccuzzi's email (defense had searchable text for all the email as of May 3, 2019)
  - o Technical correction, native files inadvertently omitted (majority were defendants' own documents)
  - o Technical correction, native files inadvertently omitted (166 files)
  - o Higher quality versions of images previously produced
- December 20, 2019
  - o Three recent videos of Phillip Braun (publicly available online)
  - o Copies of Blackstone Labs' website and online articles (17 documents)
  - o Five victim records
  - o Three FDA documents
  - o March 2019 memorandum of interview of James Boccuzzi at arrest
  - o One bank record inadvertently omitted
- January 15, 2020: Potential Brady/Giglio and early Jencks Act production
  - o 44 new documents, including grand jury transcripts, memoranda of interviews, and two documents from DEA
  - o List of bates numbers for produced documents that might be Brady/Giglio
- January 24, 2020: Supplemental DEA documents (21 documents)
- January 28, 2020: Memoranda of Interviews of DEA Chemists (2 documents)
- January 29, 2020: Supplemental FDA Adverse Event documents (14 documents)

See Ex. 2, p. 11-12. The government has also produced two supplemental expert witness disclosures in September 2019 and January 2020.

In their motion, defendants measure discovery from May 17, 2019, particularly noting the large volume of materials that arrived *before* the August 12, 2019, hearing. Mot. at 11-12. The Court's order setting a May 2020 trial date already contemplated all documents produced prior to August 2019, and as the government previously noted, the vast majority of those documents were Blackstone Labs' own records produced to the grand jury. Govt Opp'n Mot. Continuance, at 5, ECF No. 186.

II.     The Government Affirmatively Sought Out Potentially Unfavorable Evidence from DEA

The government cast a wide net in discovery at the agency involved the prosecution, FDA, including collecting documents from numerous employees who did not participate in or assist with the prosecution but had documents that were even tangentially related to the defendant corporations, their products, and their unlawful ingredients.  The FDA documents were produced in two tranches: approximately 6,600 documents on May 17, 2019, and approximately 1,400 documents on September 13, 2019.  The second tranche was delayed due to a privilege review, as explained by the government at the August 12, 2019 hearing on continuance.  Tr. Aug. 12, 2019, at 36-37.

During the privilege review, the prosecution team reviewed an October 2016 FDA document where a DEA chemist's email described dimethazine as "[i]t is related in chemical structure to anabolic steroids controlled in Schedule III of the CSA, however, this specific substance is not listed or defined as a controlled substance."[2]  Ex. 3 (the "FDA Email").  **The government produced fifteen (15) different versions of this document to all defendants in the September 13, 2019, discovery production**.  The government counsel perceived (and continue to believe) the chemist's statement included a legal error where the chemist failed to apply 21 U.S.C. § 802(41)(C) while *correctly* describing the scientific fact that dimethazine is "related in chemical structure" to listed anabolic steroids.

The government affirmatively reached out to DEA counsel on August 27, 2019, requesting to speak with the chemist who authored the document.  The government renewed the request on December 4, 2019, and the interview was ultimately scheduled for January 13, 2019.  The government will submit *ex parte* privileged documents to the Court for *in camera* review that

---

[2] The indictment spells this chemical "dimethazine," but dymethazine is also used by Blackstone Labs on its website, Ex. 1, and is the same spelling used by FDA officials in the 2016 email.  Ex. 3.

demonstrate there was no effort by the prosecution team, nor DEA, to obscure or suppress this evidence.

At the scheduled time of the interview, in January 2020, DEA counsel informed prosecutors that DEA had just located two relevant documents, and asked whether the government wished to postpone the interview to review the documents.  The two DEA documents were produced to the prosecution team on January 14, 2020, and produced to defendants on January 15, 2020.  The government immediately asked DEA to check for any additional documents on the three unlisted steroids (dimethazine, methylstenbolone, and methyl-1-etiocholenolol), and after receiving additional DEA documents on January 21, 2020, the government interviewed Terrence Boos, Section Chief of the DEA Drug and Chemical Evaluation Section, and the chemist the following day.  The government produced the new documents via email to defendants on January 24, 2020, and produced memoranda of the January 22, 2020 interviews on January 28, 2020.  Ex. 2, at p. 12.  The government issued a second broader request for relevant documents to DEA on January 28, 2020.  The government received 30 additional documents from DEA on February 11, 2020.  DEA continues to search for additional, relevant correspondence.

    a. <u>Relevant Discovery Productions</u>

On January 15, 2020, the government produced to defendants a letter and a DVD of documents titled "<u>Potential Brady/Giglio and Early Jencks Act</u>."[3]  Ex. 4.  The purpose of this disclosure was to go beyond the requirements of Rule 16 and Local Rule 88.10 (which incorporate <u>Brady</u> and <u>Giglio</u>) by specifically identifying materials already in discovery that might be of interest to the defense.[4]  The government included the Bates numbers for 118 previously produced

---

[3] The government production of potential trial exhibits in June 2019 also included potential <u>Brady</u> materials, although they were not specifically identified as such.

[4] Presumably based on this letter, defendants state the "government already conceded that its supplemental disclosures contain <u>Brady</u>/<u>Giglio</u> material, produced for the first time only four (4) months before trial."  Mot. at 4.

documents, along with five excerpts from defendant Anthony Ventrella's cell phone, all of which were previously produced in discovery to all defendants.  The government also included a number of previously undisclosed grand jury transcripts, which could be <u>Jencks</u> materials, and memoranda of witness interviews, which are not <u>Jencks</u> materials, all under the theory that they could potentially be helpful to the defense in preparing for trial.  In addition, the letter had three other new disclosures, specifically:

- Two documents from the DEA, totaling nine pages;
- A publicly available plea agreement for a previously disclosed cooperating witness;
- Potential impeachment information that a potential witness reported to police in 2017 and that no formal charges were filed.

The DEA documents were the first documents in the cover letter, and the government attached copies of the DEA documents in the email to defense counsel.  As noted above, the prosecution team first received the two documents one day prior to producing them to defendants.

III.    <u>Scope of Prosecution Team</u>

This case was investigated by special agents from the FDA Office of Criminal Investigations Miami Office ("FDA OCI").  No DEA special agents or investigators are members of the investigative team.  The prosecution team had limited contact with DEA.  In January 2017, FDA Special Agent Kelly McCoy sought advice from a DEA agent contact about specific substances, and received an answer that described the compounds as: "We looked to see if these compounds were controlled and we did not find anything scheduling them."  Ex. 5.  The DEA agent had shared Agent McCoy's inquiry with a contact at one of DEA's forensic laboratories, which are generally responsible for identifying substances submitted at trials, who responded: "Looks like neither one is controlled, but they are very close (off by a methyl group in one case) to controlled anabolics.  The first one on the label is methyl[]stenbolone and the second one is

mebolazine or dymethazine.  I wondered if they could be considered analogues, so I checked.  ODE[5] doesn't have anything on them."  Id.  The response specified "we did not find anything scheduling them."  Id.  The forensic chemists are those who test samples for drugs, as opposed to the "structural" chemists with the DEA Drug and Chemical Evaluation Section ("DOE") who opine on "substantial similarity," which is the statutory standard applicable to the three substances at issue that are not specifically listed in the CSA.  See 21 U.S.C. § 802(41)(C).

Shortly thereafter, in February 2017, undersigned government counsel sought an opinion from DOE expert structural chemists laying out specific scientific questions for the elements of 21 U.S.C. § 802(41)(C)(i)-(iii).  Ex. 6.[6]  The government counsel (including Agent McCoy) then received written confirmation from DOE Section Chief Terrence Boos that the substances in question, dimethazine and methylstenbolone, were structurally similar to listed anabolic steroids and met the scientific definitions in 802(41)(C)(i).  Id.  The government subsequently inquired in August 2018 about a third compound – methyl-1-etiocholenolol – and received another written opinion that it met the definition in 802(41)(C)(i).  Ex. 7.  Although the government's other communications with DEA are privileged and do not match any category in Rule 16, the government is submitting additional documents ex parte for in camera review.  The government contacted Section Chief Boos again in February 2019 to secure a chemist and pharmacologist for testimony at trial.  The government produced summaries of the expert witnesses' opinions on the unlisted anabolic steroids to defendants on June 12, 2019 and the listed steroids on January 8, 2020.  No DEA expert chemist has suggested to the prosecution team that the February 2017

---

[5] ODE is not an acronym but is the internal reference to the DEA Drug and Chemical Evaluation Section.  The section is currently referred to as DOE.  Ex. 8, Aff. Terrence Boos, at 1, n.1.

[6] Exhibits 6 and 7 were not produced previously and are not Rule 16 discovery:  Boos is not intended to be a trial witness, the communication is entirely inculpatory, and the government is not required to produce its investigative files.

emails, August 2018 emails, February 2019 emails, or June 2019 summaries prepared for trial are inaccurate or in conflict with DEA guidance.

IV.   <u>Meaning and Context of the DEA Documents</u>

The DEA documents produced to defense in January 2020 include several memoranda or letters that are commonly referred to by the DEA as "control status letters."  Ex. 8, Affidavit Terrence Boos, at ¶ 4.  These letters generally respond to inquiries from industry or DEA registrants who lawfully work with controlled substances, *e.g.*, pharmaceutical importers and manufacturers, pharmacies, and physicians.[7]  <u>Id.</u>  Requests also come from law enforcement officials.  <u>Id.</u>  The registrants commonly request information about specific substances to be sure the requesting parties properly register, keep records, and meet reporting requirements for particular controlled substances.  <u>Id.</u>  Section Chief Terrence Boos signs the control status letters, although they are ordinarily drafted by other members of DOE.  <u>Id.</u>  The section's chemists author a large number of the letters, approximately 20 per week, primarily for registrants.  <u>Id.</u>

Anabolic steroids not listed or defined in 21 U.S.C. § 802(41)(A) of the CSA may still violate the CSA when they are manufactured or marketed to promote muscle growth or any other pharmacological effect similar to that of testosterone, <u>see</u> 21 U.S.C. § 802(41)(C).  However, an anabolic steroid that is not listed in or does not meet the definition in 21 U.S.C. § 802(41)(A) and accompanying regulations would not typically be described as "controlled" in a control status letter.  <u>Id.</u>, at ¶ 11.   A scientist or drug distributor could lawfully possess such a substance without registering with DEA so long as they do not market the substance in violation of 21 U.S.C. § 802(41)(C).  <u>Id.</u>  ("Without having the intent set forth in § 802(41)(C), a registrant

---

[7] Any person who manufactures or distributes any controlled substance must obtain an annual registration from DEA.  21 U.S.C. § 821.  The CSA and its implementing regulations require significant responsibilities of registrants. <u>E.g.,</u> 21 U.S.C §§ 821, 822, 825, 827, 828, and 830.

handling one of those substances need not treat it as a scheduled III substance unless and until either substance is listed under the CSA.").  Responses to control status inquiries are based on the inclusion of the substance in the CSA or accompanying Code of Federal Regulations, including whether it was covered by section 802(41)(A).  Id.  Chemists responding to control status inquiries related to anabolic steroids were not initiating reviews under the substantial similarity requirements in section 802(41)(C), a process that requires a review of scientific literature plus expert analysis of chemical structures.  Id. at ¶ 7; see Ex. 9 (DEA document with results of search of scientific literature used to evaluate whether dimethazine is substantially similar).

For example, the same chemist who wrote the October 2016 email stating dimethazine was "not a controlled substance," and who drafted the June 8, 2018 control status letter also sent an email on February 2, 2017 explaining to his supervisor, "[w]e previously determined that dimethazine is not controlled, but that was based on it not being listed in the definition.  I need to review these [chemical structural diagrams] further for a determination under 21 USC 802(41)(C)."  Ex. 10.

Only when asked by this prosecution team specifically about the chemical structures and section 802(41)(C) did a DOE expert chemist conduct the scientific analysis and review required to give an opinion about the substantial similarity definition in section 802(41)(C).  The chemists then concluded the substances were substantially similar to listed steroids.  Exs. 6, 7.  In a March 14, 2017 letter to an FDA special agent in Illinois, DOE described dimethazine and methylstenbolone as "not controlled" but also noted:

However, should DEA receive information that these substances meet the criteria set forth in Title 21 United States Code, Sections 802(41)(A) or 802(41)(C), DEA will initiate rulemaking to have these steroids specifically named as anabolic steroids under the CSA.

Ex. 11.

DOE subsequently continued to issue control status letters stating that dimethazine was "not controlled," but did not intend these letters to speak to its similarity to other substances.  E.g., Ex. 12, Letter to Department of Defense (referencing 802(41)(A)) (June 8, 2018); Ex. 13. Memorandum to Jorge Jimenez, Chief, Import/Export Section, Diversion Control Division (June 21, 2018) (describing dimethazine as not a controlled substance or regulated chemical under the CSA).

When an FDA special agent working on another case asked in February 2019 for information on dimethazine and methylstenbolone, DOE responded with a scientific opinion consistent with the opinion given to the prosecution team in this case.  Ex. 14.  DOE gave the same advice again to another law enforcement agent in March 2019.  Ex. 15.

## **LEGAL BACKGROUND**

I.   Scope of Criminal Discovery

Federal criminal discovery is governed by Federal Rule of Criminal Procedure 16 and Local Rule 88.10, which incorporate the constitutional rules of Brady v. Maryland, United States v. Giglio, as well as the Jencks Act.  The rules explain both what is discoverable and what is not. Other than for constitutional reasons, Rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2).  Nor does Rule 16 "authorize the discovery or inspection of statements

made by prospective government witnesses except as provided in [the Jencks Act]." Fed. R. Crim.

P. 16(a)(2).

II.   <u>Standard for Brady Claims</u>

As originally indicated in <u>Brady v. Maryland</u>, the prosecution must disclose "evidence

which is advantageous to the defendant, and which, if suppressed, would deprive him or her of a

fair trial."  <u>United States v. Beale</u>, 921 F.2d 1412, 1426 (11th Cir. 1991).  This does not mean all

evidence, or even all favorable evidence:

> Indeed, a "defendant's right to discover exculpatory evidence does not include the
> unsupervised right to search through the [government's] files," <u>Pennsylvania v.
> Ritchie</u>, 480 U.S. 39, 59 (1987), nor does the right require the prosecution to deliver
> its entire file to the defense.  <u>See</u> <u>Agurs</u>, 427 U.S. at 109.  Rather, <u>Brady</u> obligates
> the government to disclose only favorable evidence that is "material."   The
> "touchstone of materiality is a 'reasonable probability' of a different result." <u>Kyles
> v. Whitley</u>, 514 U.S. 419, 434 (1995). Accordingly, under <u>Brady</u>, the government
> need only disclose during pretrial discovery (or later, at the trial) evidence which,
> in the eyes of a neutral and objective observer, could alter the outcome of the
> proceedings.

<u>United States v. Jordan</u>, 316 F.3d 1215, 1251–52 (11th Cir. 2003).  The government is not obliged

under <u>Brady</u> to furnish defendants with information they already have or which they can obtain

with any reasonable diligence.  <u>E.g.</u>, <u>United States v. Campagnuolo</u>, 592 F.2d 852, 861 (5th Cir.

1979) (citations omitted).

A successful defense claim under <u>Brady</u> requires that 1) the prosecution suppressed

evidence, 2) the evidence suppressed was favorable to the defense or exculpatory, and that 3) the

suppressed evidence was material.  <u>Felker v. Thomas</u>, 52 F.3d 907, 910 (11th Cir. 1995).  A <u>Brady</u>

violation does not occur even where a late disclosure is made so long as the defendant has a

sufficient amount of time to respond to the new evidence.  <u>See United States v. Simms</u>, 385 F.3d

1347, 1358 (11th Cir. 2004) (finding no violation where <u>Brady</u> information was disclosed after the

local rules deadline, as soon as the prosecutor learned of it, and where additional time prevented prejudice).  "[C]onstitutional error results from the withholding of <u>Brady</u> evidence only 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Simms</u>, 385 F.3d at 1357 (quoting <u>United States v. Scheer</u>, 168 F.3d 445, 451 (11th Cir. 1999) (citations omitted)).  The prejudice must be such that a different outcome would be *probable*, not just *possible*.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 291 (1999).

A delayed disclosure is only grounds for reversal of a conviction where the material "came so late that it could not be effectively used."  <u>See</u> <u>United States v. Bueno-Sierra</u>, 99 F.3d 375, 379-80 (11th Cir. 1996) (finding no need for reversal where a mid-trial disclosure was remedied by recess to allow defense time to consider new material); <u>United States v. Bailey</u>, 123 F.3d 1381, 1398 (11th Cir. 1997); <u>United States v. Beale</u>, 921 F.2d 1412, 1426 (11th Cir. 1991) (A <u>Brady</u> violation can also occur if the prosecution delays in transmitting evidence *during a trial*, but only if the defendant can show prejudice).  Substantial prejudice for late disclosures under Federal Rule of Criminal Procedure 16 only occurs where a defendant is unduly surprised and does not have adequate opportunity to prepare a defense.  <u>Bueno-Sierra</u>, 99 F.3d at 380.  The Eleventh Circuit has held that there is no suppression, and thus no <u>Brady</u> violation, if the defendant or his attorney knows before trial of the allegedly exculpatory information.  <u>See</u> <u>Felker</u>, 52 F.3d at 910 (where defendant alleged late disclosure for information they already knew).

III.   <u>Standard for Dismissal or Sanctions</u>

Actual prejudice to the defendant is a necessary element when a defendant seeks to dismiss an indictment for prosecutorial misconduct.  <u>United States v. Accetturo</u>, 858 F.2d 679, 681 (11th Cir. 1988) ("[D]ismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized") (citations omitted).  The Supreme Court has made clear

that dismissing an indictment for misconduct that did not prejudice the defendant is inappropriate. Bank of Nova Scotia v. United States, 487 U.S. 250, 255 (1988) (noting that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant"). The burden for dismissal of a prosecution team is the same: a showing of misconduct and actual prejudice. United States v. Kachkar, 2018 WL 6974949, at *3 (S.D. Fla. Dec. 26, 2018) (citing United States v. Walker, 243 Fed. App'x 621, 622-24 (2d Cir. 2007)). Even when misconduct and prejudice can be shown, courts first determine whether a less severe remedy could address the constitutional violation. E.g., Kachkar, 2018 WL 6974949 at *3 (collecting cases that reject dismissals for misconduct).

When contemplating sanctions due to the late production of evidence, courts must weigh several factors, including, "reasons for the Government's delay, the extent of the prejudice that the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance." United States v. White, 846 F.2d 678, 691 (11th Cir. 1988). Courts then, if necessary, impose the least severe sanction applicable to remedy the deficiencies. Id.

IV.     Hyde Amendment and Equal Access to Justice

The Hyde Amendment provides for the award of attorney's fees and litigation expenses where the government's position was "vexatious, frivolous, or in bad faith." 18 U.S.C. § 3006A. To succeed on such a claim, the government's legal position must be shown to have been "asserted in bad faith or without any foundation or basis for belief that it might prevail." United States v. Gilbert, 198 F.3d 1293, 1303 (11th Cir. 1999). This is a "daunting" proposition. Id. at 1302. This is an objective standard, and even in an instance of apparent personal animus, if there is an objective basis for the government's proceeding, the claim must fail. See United States v. Shaygan, 652 F.3d 1297 (11th Cir. 2011) (overturning an award of fees where there was an

objectively reasonable basis for the prosecution); cf. United States v. Adkinson, 135 F.3d 1363 (11th Cir. 1998) (finding an award of fees appropriate where the government indicted and tried a charge under a theory of fraud which had been rejected by the Eleventh Circuit).

## ARGUMENT

The defendants' motion lacks a basis in law and relies on egregiously false and unsubstantiated accusations about the prosecution team's conduct.  In fact, the government has exceeded its discovery obligations and diligently sought out and produced information favorable to the defense.  Moreover, the recently produced DEA information does not actually contradict the factual allegations or legal theory in the indictment, which correctly alleges the language in the charged statute.  If they meet the standards for admissibility, the defendants may be entitled to explore the documents at trial on cross-examination, but the mere fact they received the offending documents four months before trial is sufficient to deny their claim of Brady violations and misconduct.

   I.   Defendants' Claims Are Based on Wholly Unsupported Accusations

The government has repeatedly exceeded its discovery obligations, including taking affirmative efforts to seek evidence even *potentially* favorable to the defense.  Rather than credit the government for turning over evidence they consider important, the defense relies on numerous inaccurate statements to make their claims.  For example, the following statements from their motion are incorrect and demonstrably false:

- "Yet, the government knew the Chief of Diversion Control, not some unnamed 'chemist' issued a definitive determination letter to the FDA stating the substances were not controlled substances."  Mot. at ¶ 6.
- "The [January 15, 2020 discovery] letter contains what appears to be misinformation intended to mislead the defense."  Mot. at ¶ 10.
- "Because prosecution counsel authored some of the emails himself, his apparent attempt to blame the late production of discovery on the DEA is inaccurate."  Mot. at ¶ 10.

- "The record indicates the government has consistently suppressed <u>Brady</u> evidence directly affecting Counts 1 and 4-8 and misled defense counsel about what they knew and when they knew it."  Mot. at ¶ 26.
- Describing the prosecution as a "years-long campaign of concealment and deception." Mot. at ¶ 34.

The DEA documents themselves, *e.g.*, Ex. 10, the government's cover letter, Ex. 4, and Boos affidavit, Ex. 8, conclusively rebut these inflammatory accusations.  The chemist who called dimethazine "not controlled" wrote in a contemporaneous email that he had not analyzed the substance under 802(41)(C).  Ex. 10.  As set forth in Section Chief Boos's affidavit, control status letters are primarily issued for the sole purpose of informing registrants of their handling obligations under the CSA – not a "definitive determination" that a substance does not violate 802(41)(C).  Ex. 8 at ¶¶ 5, 9-11.  The government's cover letter accurately represented that the DEA documents had arrived the day before.  Ex. 4.  In addition, the government will submit *in camera* privileged documents that show the prosecution team's diligence and efforts to assist the defense, even without a defense request.  The hyperbolic statements in the defense motion can have only one purpose:  to obscure that – as a matter of law – the defendants' motion cannot succeed where the government voluntarily produced the information in question four months before trial and immediately after becoming aware of its existence.

II.   <u>Defendants' Brady Claim Must Fail Given That Documents Were Produced Four Months Before Trial</u>

A careful review of the controlling law and facts will clearly show that defendants have not alleged a valid <u>Brady</u> claim, much less prosecutorial misconduct or the extreme prejudice necessary for dismissal or sanctions.  The defendants fail to adequately allege or provide evidence that they meet *any* of the prongs of a <u>Brady</u> violation: suppression of evidence, that the suppressed evidence was materially exculpatory, or substantial prejudice.

a. <u>Affirmative Government Disclosure Before Trial Cannot Be a Constitutional Violation</u>

As an initial matter, there can be no constitutional <u>Brady</u> violation for pretrial disclosure so long as defendants have a sufficient amount of time to respond to new evidence.  <u>E.g.</u>, <u>Simms</u>, 385 F.3d at 1358; <u>United States v. Parnell</u>, 723 F. App'x 745, 751 (11th Cir. 2018) (no <u>Brady</u> violation where government produced "large hard drive of documents" less than a month before trial), cert. denied sub nom. <u>Wilkerson v. United States</u>, 139 S. Ct. 353 (2018), reh'g denied, 139 S. Ct. 659 (2018), cert. denied, 139 S. Ct. 491 (2018).  Courts repeatedly find that even *material exculpatory documents disclosed during trial* may have sufficient time to avoid prejudice.  <u>E.g.</u>, <u>Bueno-Sierra</u>, 99 F.2d at 379-80 (no reversal for mid-trial disclosure); <u>United States v. Jeri</u>, 869 F.3d 1247, 1258 (11th Cir. 2017) (endorsing a continuance or short recess for new evidence disclosed the morning of trial, but no <u>Brady</u> violation); <u>United States v. McGhee</u>, 553 F. App'x 895, 900 (11th Cir. 2014).

Here, the government produced the documents four months before trial, and before pretrial defense motions were filed.  In addition, a <u>Brady</u> violation requires a determination that "a reasonable probability, that had evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Simms</u>, 385 F.3d at 1357.  Here, the documents *were* disclosed here, and there is no past proceeding – no evidentiary hearing, trial or outcome that the defense can claim should have been different.  Instead, the defendants complain of alleged misconduct without evidence.

b. <u>No Documents Were Suppressed</u>

A puzzling aspect of the defendants' claim is that these documents – which they received directly from the prosecution team – were suppressed.  Documents delivered four months prior to trial have not been suppressed.  Nor can there be a legitimate <u>Brady</u> claim of suppression where

the government took affirmative efforts to uncover the information, and then produced it immediately.  Cf. United States v. Deutsch, 475 F.2d 55 (5th Cir. 1973) (finding Brady violation where government refused to check Post Office employee records of its chief witness).  In addition, the defense made no request for DEA documents that would have put the government on notice to make additional efforts to search for these documents.  Cf. United States v. Veksler, 62 F.3d 544, 550 (3d Cir. 1995) (defense request for information may result in "constructive knowledge" on part of prosecution).  While defendants contend, without evidence, that the government "withheld" the documents, this theory falls apart on the undisputed fact that the government delivered these documents on its own accord immediately after becoming aware of them.  It bears repeating that the government produced the initial DEA documents to defendants the *day after it received them*.

There is also no valid claim that this information was suppressed when 15 versions of the FDA emails were turned over to defense more than seven months before trial.  Importantly, the FDA emails contained essentially the same information about dimethazine as the DEA control status letters.  Subsequently, the government diligently pursued the one piece of potentially conflicting evidence it had (the FDA emails), and that process resulted in an immediate disclosure to the defendants.  Further, the prosecution team was unaware of the control status letters until January 2020, and thus cannot have suppressed them.  Where the documents were not actually suppressed, there is no valid Brady claim, e.g., Felker, 52 F.3d at 910, and discovery sanctions are unnecessary, much less the dismissal of an indictment for which defense has shown no prejudice.

c.   The DEA Documents Are Not Exculpatory and Not Material

The defense motion asserts that the indictment was grounded on false evidence, relying on the incorrect theory that DEA informed the prosecution team that the substances were not subject to DASCA.  See United States v. Naranjo, 634 F.3d 1198, 1212 (11th Cir. 2011) ("[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice

to prove 'materiality.'" (quoting Jordan, 316 F.3d at 1252 n. 81)).  Notably, defendants do not, and cannot, claim that they somehow relied on information from DEA that their products were not controlled substances.

No facts support the claim that the DEA chemists had analyzed section 802(41)(C) and determined that dimethazine and methylstenbolone were not controlled substances.  Rather, the contemporaneous DEA documents and Affidavit of Section Chief Terry Boos establish that the control status letters were *not* an analysis under section 802(41)(C).  E.g., Ex. 10 ("I need to review these [chemical structural diagrams] further for a determination under 21 USC 802(41)(C)."). Several of the documents omitted an acknowledgement that the control status review did not include an analysis under § 802(41)(C), which may have introduced some confusion into the present proceeding.  But that does not in fact demonstrate inconsistency between those § 802(41)(A) reviews and the § 802(41)(C) analysis conducted for the present case.  Nor is there evidence that DEA chemists were disagreeing with their colleagues' expert opinions.

In making their claim about materiality, the defense overlooks a straightforward way of proving guilt for an analogue substance.  In an analogue case, the government can prove the defendants knew the chemical structure of a substance that fell within the statutory definition of § 802(41)(C) (the theory attacked by defense).  The government can also rely on evidence that defendants knew the substances were controlled under federal drug laws.[8]  E.g., McFadden, 135 S. Ct. 2298 (2015).  This knowledge can be proved by direct or circumstantial evidence.  Id. at 2304 n. 1.  The government intends to prove *both* in its case.  The government proffers that its expected trial proof includes direct evidence, including testimony and documents, that ***each defendant knew that these substances were controlled substances***, as well as circumstantial

---

[8] The government's Opposition to Motion to Dismiss Counts 1, 4-8, ECF No. 258, and Opposition to Motion to Dismiss Counts 1, 4-8 for Vagueness (responding to ECF No. 239) discuss this issue at greater length.

evidence of the same.  The government's trial proof is also expected to include expert testimony, testimony of co-conspirators, testimony of the defendants' agents and employees, and numerous documents created or adopted by the defendants that are directly relevant to their knowledge that dimethazine, methylstenbolone, and methyl-1-etiocholenolol meet the statutory definition of anabolic steroids in § 802(41)(C)(i)-(iii).  See e.g., Ex. 1.

> d.  The Defendants Are Not Prejudiced Given That They Possess the Necessary Information Well in Advance of Trial

As the defense concedes, they received the DEA documents four months before trial, and in advance of their filing of pretrial motions.  Mot. at 3, ¶ 4.  No defendant asked for an extension of the filing deadline after receiving the DEA documents.[9]  The defendants claim that, for the DEA documents, "[e]arly production . . .  was essential and would definitely have resulted in a completely different effort by the defendants to prepare for trial."  Mot. at ¶ 16.  Yet, the essential information for this theory was actually produced in September 2019 in the FDA emails where a DEA chemist described a steroid in the indictment as "not . . . defined as a controlled substance" without an evaluation under section 802(41)(C).  In fact, 15 documents from FDA containing this information were produced to all defendants in searchable e-discovery format.[10]  Thus, there is obviously no actual prejudice.  Even as defendants claim the DEA documents alter their trial strategy, they cannot articulate actual prejudice where the government affirmatively identified the information for them four months before trial.  With no actual prejudice, defendants cannot prevail on a Brady claim, and their request for dismissal is inappropriate.

---

[9] Defense counsel and the government conferred on defendants' request for an extension before they received the DEA documents, and the government did not oppose a two-week extension.  The government also informed Richard Lubin, the only counsel to initiate a conversation about the DEA documents, that the government would be amenable to an additional extension to the motions deadline if specific to the DEA documents.

[10] This specific September 2019 production from FDA was less than 1,500 documents, which presumably could have been reviewed in a matter of days.  See Joint Def. Mot. Continuance, ECF No. 180, 7 at ¶ 18 (stating defense would review 17,000 pages per week).

III.     Defense Claims of Discovery Violations Lack Credibility Where Government Exceeded
         Its Discovery Obligations

     Defendants recycle stale and unsuccessful arguments about discovery that occurred before

the August 12, 2019 hearing, where they erroneously contended the government misrepresented

the schedule and productions of discovery.  The credibility of these defense argument is evident

in their claim that the potential trial exhibits produced by the government 11 months before trial

are one of "many and extensive discovery violations by the prosecutions." Mot. at 3, ¶ 11.  The

government already refuted these claims at the August 12, 2019 hearing and in writing, see Opp'n

Mot. Continuance, at 4-7, and the government's discovery log shows how far off defendants'

misconduct claims are from the facts.  Rather, the discovery log demonstrates the extensive and

ongoing efforts by the government to produce all relevant evidence, including evidence that

exceeds Rule 16 obligations.  In addition, the log verifies that the recent productions are minimal;

literally a few dozen documents compared to the million documents produced more than ten

months before trial.  Ex. 2.

IV.      Sanctions Are Not Appropriate

     Defendants' proposed remedies are unwarranted and not supported by law.  See United

States v. Turner, 871 F.2d 1574, 1580 (11th Cir. 1989) (noting "[e]xclusion of relevant evidence

is an extreme sanction") cert. denied, 493 U.S. 997 (1989); United States v. Ramamurphy, 2019

WL 451175 (S.D. Fla. Feb. 5, 2019).  Brady does not "create a broad, constitutionally required

right of discovery."  Jordan, 316 F.3d at 1251-252.  "Indeed, a 'defendant's right to discover

exculpatory evidence does not include the unsupervised right to search through the [government's]

files.'"  Id.  In actual misconduct cases, courts are required to choose the least severe remedy, and

only can administer sanctions for extreme prejudice.  Accetturo, 858 F.2d at 681.

For all the foregoing reasons, defendants have failed to meet the requirements for sanctions. E.g., Bank of Nova Scotia, 487 U.S. at 255.  Where there is no actual misconduct and no actual or even potential for prejudice, sanctions are inappropriate.  If the Court determines that some remedy is warranted, a short continuance would cure even a risk of prejudice.

V.    Defense Claim for Hyde Amendment Attorney Fees Is Contradicted By Eleventh Circuit Law

The claim for attorney fees should be denied because the Hyde Amendment is reserved for conduct "without any foundation or basis." Gilbert, 198 F.3d at 1303.  Discovery violations alone cannot can support an award of attorney's fees and costs under the Hyde Amendment.  Shaygan, 652 F.3d at 1315.  The Hyde Amendment also does not "license judicial second-guessing of prosecutions that are objectively reasonable." Id. at 1314.  The prosecution's conduct cannot be objectively unreasonable where they took diligent efforts to pursue information favorable to the defense, and then disclosed information as it was received.  Otherwise, every case with late Brady disclosures would results in sanctions and attorneys' fees, a proposition clearly contradicted by the numerous Eleventh Circuit cases holding there were no Brady violations in cases where the evidence was disclosed during or after trial.  E.g., Bueno-Sierra, 99 F.2d at 379-80.

In addition, the defense claim that the indictment relied on a faulty scientific premise is wrong and unsubstantiated.  The Supreme Court has noted that "so long as the prosecutor has probable cause to believe that the accused committed an offense *defined by statute,* the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (emphasis added). Here, the DEA's expert structural chemists have consistently opined to the prosecution team since February 2017 that dimethazine and methylstenbolone are substantially similar to listed anabolic steroids.  In any event, reliance by the prosecution on an opinion from a government expert is

objectively reasonable, particularly where the defendants own marketing of the products claimed they were similar to anabolic steroids.

## **CONCLUSION**

Therefore, the Government respectfully requests that the Court deny the motion to dismiss and for sanctions, and make a finding that the government did not commit misconduct as a matter of law and fact.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

GUSTAV W. EYLER
DIRECTOR
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH


_____*/s/ Alistair Reader*_____

By:   ALISTAIR F. A. READER
      Court ID A5502377
      STEPHEN J. GRIPKEY
      Court ID A5502620
      Trial Attorneys
      DAVID A. FRANK
      Court ID A5500486
      Senior Litigation Counsel
      U.S. Department of Justice
      Consumer Protection Branch
      450 Fifth Street, NW Suite 6400-South
      Washington, DC 20001
      Alistair.F.Reader@usdoj.gov
      (202) 353-9930
      Stephen.Gripkey@usdoj.gov
      (202) 307-0048
      David.Frank@usdoj.gov
      (202) 307-0061
      (202) 514-8742 (facsimile)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 14, 2020, a copy of the foregoing document was filed electronically with the Clerk of the Court by way of the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of CM/ECF system.  Parties may access this filing through the CM/ECF system.

_____*/s/ Alistair Reader*_____
Alistair F.A. Reader
Trial Attorney
U.S. Department of Justice