UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80030-CR-DIMITROULEAS

UNITED STATES OF AMERICA

vs.

PHILLIP BRAUN,
AARON SINGERMAN,
ANTHONY VENTRELLA,
JAMES BOCCUZZI,
DAVID WINSAUER,
BLACKSTONE LABS, LLC, and
VENTECH LABS, LLC,

                    Defendants

_____/

GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE
WITNESSES IN LIMINE AND STRIKE SURPLUSAGE FROM INDICTMENT

The United States of America, by and through undersigned counsel, hereby files its

opposition to defendants' Motion in Limine to Exclude Certain Witnesses from Testifying and

Strike Surplusage from the Indictment.  ECF No. 441.  The Court should deny the motion as the

evidence in question directly relates to the alleged conspiracy to defraud the United States and to

commit mail and wire fraud, or in the alternative, deny the motion because it is premature.[1]  The

witness testimony in question is relevant to the misrepresentations that the defendants made about

the legality of their products and the status of their products as dietary supplements.  As a result,

the testimony would be directly probative and not unduly prejudicial within the meaning of Federal

Rule of Evidence 403.  Additionally, defendants incorrectly characterize certain portions of the

_____

[1] The motion to strike surplusage may also be untimely as pretrial motions were litigated in March 2020.  E.g., Order
Denying Motion to Strike Surplusage, ECF No. 318.

indictment as surplusage by simply ignoring the crimes to which they are relevant, such as conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, as charged in Count 1.

## MATERIAL FACTS

### A. Potential Government Witnesses

The government intends to call several witnesses at trial who purchased and consumed products distributed by defendant Blackstone Labs, LLC ("Blackstone"). These witnesses each subsequently contacted Blackstone with concerns that the products caused health problems.  Each witness would testify about their individual experience, the representations they relied upon in purchasing the defendants' products, the reason they subsequently contacted Blackstone, and the response they received from Blackstone, if any.  These potential witnesses all purchased their products during the time period of the conspiracy alleged in Count 1, and several purchased products containing anabolic steroids during the drug conspiracy alleged in Count 4.  One anticipated government witness is C.H., who is alleged in Count 4 of the indictment to have suffered serious bodily injury from anabolic steroids distributed by Blackstone.  C.H. would testify about the specifics of his bodily harm, in addition to the testimony of medical experts who attended him while he was hospitalized for liver and kidney failure.  C.H.'s spouse may also testify about the harm to C.H. and her communications with Blackstone.  The government also expects to call several other witnesses who contacted Blackstone about adverse events associated with their products, including R.R., S.L., and M.G., depending on the progress of trial and necessary proof. The defendants have been on notice about the existence of these individuals and their relevance to the case.  Discovery about each of these witnesses was disclosed to the defense more than a year ago, in some cases two years, as detailed below.

2

## B. **Relevant Allegations in the Indictment**

The defendants are charged in Count 1 of the indictment with a conspiracy with two objects: (1) to defraud the Food and Drug Administration ("FDA"), and (2) to commit mail and wire fraud, specifically, "to knowingly and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made." Indictment, ECF No. 1 (hereafter, "Indictment"), Count 1, at ¶¶ 2a, 2b. Counts 2 and 3 allege distribution of unapproved new drugs with intent to defraud and mislead, in violation of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331 *et seq*. Count 4 alleges a conspiracy to distribute anabolic steroids, and that a specific steroid caused serious bodily injury to victim C.H. In short, the defendants agreed to falsely market their products as legal dietary supplements and to falsely represent that their products were made in an FDA-approved, GMP [Good Manufacturing Practices]-certified facility, while interfering through deceit, craft, or trickery with FDA's lawful government functions to regulate drugs and dietary supplements. The Indictment alleges numerous ways that the defendants misled consumers and the FDA, including, for example:

    (A)   Falsely claiming the products were dietary supplements that safely promote muscle growth and strength (Manner and Means ¶ 4);

    (B)   Hiding that ingredients were imported from China under false and fraudulent documentation (Manner and Means ¶ 6);

    (C)   Failing to notify FDA of adverse events, even when required by law (Manner and Means ¶ 7);

    (D)   Claiming products were manufactured in an FDA-approved, registered and inspected facility with good manufacturing practices (Manner and Means 8);

    (E)   Falsely claiming that their manufacturing facility "follows all FDA guidelines" (Manner and Means ¶ 8);

    (F)   Falsely claiming that certain products were independently lab tested (Manner and Means ¶ 8);

    (G)   Establishing a shell company to manufacture illegal products (Manner and Means ¶ 9);

(H)  Creating fraudulent documents and records (Manner and Means ¶ 10);

(I)  Lying to consumers (Manner and Means ¶ 10);

(J)  Calling their Super DMZ RX 2.0 product a dietary supplement that was "100% legal" (Overt Act  4);

(K)  Directing employees to "fire sale" a product the FDA notified them was illegal (Overt Act 12);

(L)  Avoiding advertisements in magazines because "someone who saw it might report us to FDA" (Overt Act 16);

(M)  Instructing an employee to falsely tell consumers that raw ingredients were ordered from the United States, rather than China (Overt Act 17);

(N)  Instructing employees to falsely tell consumers that the shell company, Fight Pharm, was "NOT our company," (Overt Act 30);

(O)  Creating and using a forged Certificate of Free Sale, a document normally produced by FDA (Overt Act 35);

(P)  Lying to FDA about when Blackstone stopped selling the product Super DMZ (Overt Acts 38 and 39);

(Q)  Instructing a consumer to ignore contact from an FDA criminal investigator (Overt Act 40).

The defendants' fraudulent misrepresentations included numerous material omissions as well, such as failing to inform consumers that products were manufactured in unregistered facilities that did not maintain good manufacturing practices, and not telling consumers that specific ingredients were not dietary ingredients, and had previously been described as unapproved new drugs by the FDA.

**C.  Notice to the Defendants of Victim Witnesses**

The government repeatedly provided notice to the defendants that Blackstone victims would likely testify at trial.[2]  In March 2019, the government produced a no-contact/witness list to all defendants, which included the full names of 12 witnesses who would potentially testify about their purchase and consumption of Blackstone products, and/or their contact with Blackstone.  The list included the full names of the majority of the victims mentioned in the defendants' current

---

[2] The Court also granted a government request to create a public website for alternative victim notification.  Order Auth. Use of Alt. Victim Notification Procedures, ECF No. 67 (Mar. 29, 2019).  Potential victims have contacted the government through the public contacts and it is possible that additional victim witnesses would be noticed before trial.

motion in limine, including R.R., C.H., S.L., M.G., T.L., D.G., G.S., J.Z., C.D., and S.N.   In an April 2019 unopposed motion to designate the case as "complex," the government noted that it "expects a lengthy trial with . . . several consumer-victims."   ECF No. 94, at 5.   In December 2019 (Government Production 17), the government produced an electronic folder titled "Victim Records," which contained records for victims C.H., S.L., C.D., and G.S.   In January 2020, the government produced memoranda of interviews with nine victims, including C.H., S.L., R.R., M.G., and C.D., along with relevant documents.   Nor were the victims' identities obscured from the defendants; the cover letter accompanying this production listed their full names.

The government also produced all medical records in its possession, including thousands of pages for victim C.H., who is alleged to have suffered serious bodily injury in Count 4 of the Indictment.   The government subsequently assisted the defense by securing HIPAA releases from C.H., and joining in subpoenas for additional medical records requested by the defendants.[3]   The government also produced medical records in discovery from additional victims that the witnesses voluntarily produced to the government. The government does not believe that those witnesses' medical records are necessary or relevant to the trial, other than C.H.   The defendants have not attempted to subpoena records from victims other than C.H., more than two years after indictment and less than two months before trial.

### D. Adverse Events

The indictment alleges that Blackstone failed to report adverse events to FDA, even when required by law, stating specifically:

> **PHILLIP BRAUN and AARON SINGERMAN** caused **BLACKSTONE** to evade FDA's regulatory authority and disregard requirements of the FDCA. Among other things, **BLACKSTONE** disregarded complaints from consumers who reported getting ill or injured from **BLACKSTONE's** products.

---

[3] The medical records received by the defense were provided to the government after the expert deadline, and after the government requested the records from defense counsel.

> **BLACKSTONE** failed to notify the FDA of such complaints, even when required by law.

Indictment, p. 9, ¶ 7.  The defendants have not disputed that Blackstone never reported adverse events to the FDA, serious or otherwise.  The FDA was unable to locate any record that Blackstone ever reported an adverse event to FDA.  The government anticipates calling former Blackstone employees as witnesses at trial who would corroborate that the defendants did not submit adverse event reports.

## LEGAL STANDARDS

### A.  Federal Rules of Evidence

Evidence is "relevant" under Rule 401 of the Federal Rules of Evidence if it has any tendency to make a fact more or less probable than it would be without the evidence, and is of consequence in determining the action.  United States v. McGregor, 960 F.3d 1319, 1323 (11th Cir. 2020).  Federal Rule of Evidence 403 permits the exclusion of evidence on the basis of unfair prejudice only when the probative value is "substantially outweighed" by undue prejudice.  E.g., United States v. Smith, 967 F.3d 1196, 1205–06 (11th Cir. 2020).  This "is an extraordinary remedy" that should be rarely granted.  McGregor, 960 F.3d at 1324 (internal citations omitted).  "In applying Rule 403, courts must look at evidence in a light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (quoting Aycock v. R.J. Reynolds Tobacco Co., 769 F.3d 1063, 1069 (11th Cir. 2014) (internal citations omitted)); accord United States v. Finestone, 816 F.2d 583, 585 (11th Cir. 1987) ("The balance [under Rule 403] should be struck in favor of admission.") (internal citations omitted). See United States v. Williams, 816 F.2d 1527, 1532 (11th Cir. 1987) (excluding otherwise relevant acts that "are of such a heinous nature that they are likely to sway the jury irrevocably to a decision of guilt").

Federal Rule of Evidence 404(b) governs the exclusion of evidence of unrelated bad acts

or crimes.  The rule allows the introduction of evidence of a prior or uncharged act if the government can demonstrate: (1) a proper purpose for introducing the evidence; (2) that the defendant engaged in the prior act; and (3) that the probative value of the evidence is not substantially outweighed by any prejudicial effect the evidence might have.  E.g., United States v. Troya, 733 F.3d 1125, 1131–32 (11th Cir. 2013).  Exclusion under Rule 404(b) is inapplicable where the evidence arises out of the same series of acts as the underlying crime, or where it concerns the overt acts of a co-conspirator.  See United States v. Collins, 779 F.2d 1520, 1532 (11th Cir. 1986).

## B. Surplusage

A motion to strike surplusage from an indictment may only be granted where the language is "not relevant to the charge *and* [is] inflammatory and prejudicial."  See United States v. Huppert, 917 F.2d 507, 511 (11th Cir. 1990) (emphasis added).  This is an "exacting standard."  Id.  Even when language is found to be prejudicial, it should not be stricken if it is relevant to the charged offense.  United States v. Williams, No. 07-80179-CR, 2008 WL 4867748, at *3-4 (S.D. Fla. Nov. 10, 2008) ("Such language, if legally relevant, cannot be considered surplusage no matter how prejudicial it may be.") (citing United States v. Climatemp, Inc., 482 F. Supp. 376, 391 (N.D. Ill. 1979)).  On appeal, the standard of review for a motion to strike surplusage is abuse of discretion. See e.g., United States v. Marroquin-Lopez, 634 F. App'x 758, 764–66 (11th Cir. 2015).

## C. Legal Elements of the Relevant Indictment Allegations

The Indictment alleges a conspiracy to defraud the FDA and to commit mail and wire fraud, along with felony distribution of unapproved new drugs and other crimes.  Under 18 U.S.C. § 371, it is a crime for two or more persons to conspire to defraud the United States, or any agency of the United States, in any manner or for any purpose.  A conspiracy to defraud the United States is also

known as a <u>Klein</u> conspiracy.  <u>United States v. Klein</u>, 247 F.2d 908 (2d Cir. 1957).  The government must allege and prove there was an agreement whose purpose was to impede a federal agency, and that each defendant knowingly participated in that agreement.  <u>United States v. Adkinson</u>, 157 F.3d 1147, 1154 (11th Cir. 1998) (citations omitted).  The government must also prove that at least one of the conspirators knowingly engaged in at least one overt act.  <u>E.g.</u>, <u>United States v. Gonzalez</u>, 834 F.3d 1206, 1214 (11th Cir. 2016).

To conspire to defraud the United States means "to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." <u>United States v. Porter</u>, 591 F.2d 1048, 1055 (5th Cir. 1979); <u>United States v. Lozada</u>, 742 F. App'x 451, 452 (11th Cir. 2018) (citing <u>United States v. Puerto</u>, 730 F.2d 627, 630 (11th Cir. 1984)).  It is enough that the conspiracy causes the agency's "legitimate official action and purpose [to] be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention." <u>Hammerschmidt v. United States</u>, 265 U.S. 182, 188 (1924).  A <u>Klein</u> conspiracy "need not cause any monetary loss to the government," so long as it interferes with or obstructs the government's lawful functions.  <u>United States v. Puerto</u>, 730 F.2d 627, 630 (11th Cir. 1984) (citing <u>Hammerschmidt</u>, 265 U.S. 1182 at 188 (1924)).

The essential elements of mail fraud are (1) a scheme to defraud someone using false or fraudulent representations, pretenses or promises; (2) the false representations were about a material fact; (3) the defendant intended to defraud someone; and (4) the defendant used the U.S. mail or an interstate commercial carrier to help carry out the scheme.  18 U.S.C. § 1341; <u>Neder v. United States</u>, 527 U.S. 1, 25 (1999).  A fact is "material" if it has the capacity or natural tendency to influence a person's decision, regardless of whether the person relied on the statement or knew it was false.  <u>United States v. Neder</u>, 197 F.3d 1122, 1128–29 (11th Cir. 1999). "Fraud, for

purposes of a mail fraud conviction, may be proved through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation." United States v. O'Malley, 707 F.2d 1240, 1247 (11th Cir. 1983).  The government must prove that the defendant "intended to defraud a victim of money or property of some value."  United States v. Cooper, 132 F.3d 1400, 1405 (11th Cir. 1998).  Wire fraud requires the same proof, except instead of mail, the defendant must transmit or cause to be transmitted by wire, some communication in interstate commerce in furtherance of the fraud.  E.g., United States v. Bradley, 644 F.3d 1213, 1238 (11th Cir. 2011).

## D.   Required Reporting for Serious Adverse Events

The Food, Drug, and Cosmetic Act requires reporting of any serious adverse events by a manufacturer, packer, or distributor whose name appears on the label of a dietary supplement marketed in the United. States.  21 U.S.C. § 379aa–1(b)(1).[4]  The statute requires submission to the government of "any report received of a serious adverse event associated with [a] dietary supplement when used in the United States, accompanied by a copy of the label on or within the retail packing of such dietary supplement."  Id.  Some retailers must also file reports.  § 379aa–1(b)(2).  If a manufacturer or distributor receives a serious adverse event report via phone or their official address, the report shall be submitted by a dietary supplement manufacturer or distributor no later than 15 business days after the report is received. § 379aa–1(c)(1).  The statute defines a serious adverse event as any health-related event associated with the use of a dietary supplement that

(A) results in--

    (i)    death;
    (ii)   a life-threatening experience;
    (iii)  inpatient hospitalization;

_____

[4] Similar provisions requires reporting of serious adverse events for drugs.  21 U.S.C. § 379aa and 21 C.F.R. § 310.305.

> (iv)     a persistent or significant disability or incapacity; or
> (v)      a congenital anomaly or birth defect; or

> (B) requires, based on reasonable medical judgment, a medical or surgical intervention to prevent an outcome described under subparagraph (A).  21 U.S.C. § 379aa–1(a)(2).

The statute requires use of a specific "MedWatch" adverse event reporting form, and that records be maintained for all adverse events, not just "serious adverse events," for six years.  21 U.S.C. § 379aa–1(e)(1).  FDA also accepts voluntary reporting for adverse events that did not rise to the level of a serious adverse event.  <u>See</u> How to Report a Problem with Dietary Supplements, U.S. Food and Drug Administration, <u>https://www.fda.gov/food/dietary-supplements/how-report-problem-dietary-supplements</u> (last visited Aug. 26, 2021).

## ARGUMENT

The witnesses and indictment language in question are directly relevant to and probative of the charges, and are not unduly prejudicial.  Testimony from witnesses who purchased Blackstone products is directly relevant to the conspiracy to defraud consumers via mail and wire fraud.  That these witnesses later contacted Blackstone because they experienced adverse health events associated with the products is not unduly prejudicial, but rather additional evidence of the Count 1 conspiracy.  Blackstone's response to these individuals was consistently to dismiss, ignore, or cover up their health problems, even if that meant failing to report serious adverse events to FDA as required by law.  In any event, it would be premature to exclude witnesses before trial.  Finally, the language identified by defendants as "surplusage" is relevant and should not be struck. The Court should deny the motion.

### A.  <u>Testimony from Witnesses Defrauded by Blackstone Labs Is Relevant</u>

The Court should not exclude witnesses whose testimony is directly relevant to defendants'

scheme to defraud consumers and the FDA.  The defendants' effort to strike all "complaining witnesses" cannot prevail where the witnesses may have relevant testimony.  See Def. Mot. at 3. Count 1 requires the government to prove false representations about a material fact.  A fact is "material" if it has the capacity or natural tendency to influence a person's decision, regardless of whether the person relied on the statement or knew it was false.  Neder, 197 F.3d at 1128–29.  A consumer who purchased Blackstone products is ideally situated to provide evidence about this element and the related factual allegations in the indictment.  For example, a witness who sought to purchase a lawful dietary supplement made with dietary ingredients (e.g., herbs, minerals, or amino acids) would testify that they purchased a Blackstone product because it was labeled as a dietary supplement.  The witness could testify about the representations they relied upon in purchasing and consuming the product, whether from the label, Blackstone's website, or other sources related to the defendants.  Similarly, the witness could testify whether omitted facts would have influenced their decision to purchase the product, such as a failure to inform them that the products were manufactured without current good manufacturing practices, or a failure to inform them that the steroid products were unapproved new drugs that the FDA had previously advised were unsafe and unapproved or even anabolic steroids that were unlawful to distribute.

Here, where Blackstone is alleged to have made material affirmative misrepresentations and misleading omissions over the course of six years, different victims may have received different misrepresentations, or would have been influenced by different material facts.  Where the Indictment alleges a long-lasting conspiracy, the evidence naturally would include testimony pertinent to different points in time.  Such evidence would not be cumulative, but relevant and probative in proving that the conspiracy continued throughout the time period.  For example, in United States v. Bianco, the Eleventh Circuit rejected an appeal based on the admission of

repetitive testimony by victims in a mail and wire fraud case.  181 F. App'x. 846 (11th Cir. 2006).

At trial, each victim was asked whether the defendant omitted disclosing his criminal background

and other facts, and whether this information would have affected the victim's decision to invest

with the defendant.  Id. at 849.  Although cumulative, this evidence was admissible as intrinsically

linked to the charges.  Id. at 853.  In the present case, the Court should similarly admit testimony

from victims about material omissions or affirmative misrepresentations by defendants that would

have affected their decision to purchase and consume specific Blackstone products.

As Count 1 is a conspiracy which continued until 2018, misrepresentations or material

omissions made to victims *after* they consumed a Blackstone product would also be evidence the

scheme to defraud continued, and of the purpose of the conspiracy: to distribute illegal products

without regulatory oversight by the FDA.  Indictment at 8, ¶ 3.  For each potential witness,

Blackstone continued to sell the offending product after the victim witness contacted Blackstone.

Lastly, testimony from witnesses who consumed Blackstone products with steroids would

also be probative evidence of the Count 4 drug conspiracy.  Here, where medical and

pharmacology experts are expected to testify about the specific effects of anabolic steroids on the

human body, evidence that Blackstone products in fact caused identical effects in multiple

individuals is relevant to prove the Count 4 conspiracy.  A juror could properly conclude that a

product included anabolic steroids where multiple individuals consumed the product and

experienced symptoms or results consistent with anabolic steroids.  This evidence would be highly

probative that the defendants joined a conspiracy to distribute anabolic steroids.

**B.  <u>Notice of Serious Adverse Events is Relevant Evidence</u>**

Evidence that Blackstone was notified of serious adverse events and did not report them to

the FDA is relevant and is not unduly prejudicial where they labeled their products as dietary

supplements.  As alleged in the indictment, the defendants purposefully failed to report any adverse events in order to maintain their scheme to defraud the FDA; their ongoing scheme relied on avoiding regulatory scrutiny from FDA.  The defendants now seek to exclude all victims other than C.H., including those who notified Blackstone of serious adverse events.  These victims' testimony will be relevant to the charges for the reasons discussed above, and also because their reports to Blackstone triggered a reporting obligation.  At least two victims who may testify (C.H. and R.R.) notified Blackstone that they were hospitalized during their adverse event, which automatically triggers the statutory obligation to report.  Another victim spent time in the emergency room and other victims suffered permanent changes to their body, e.g., gynecomastia (the inappropriate growth of breast tissue).

Moreover, the victims' testimony is relevant beyond their hospitalization or injuries from consuming the defendants' steroids and unapproved drugs.  Their testimony speaks to multiple elements of the charged conduct, such as evading detection by FDA and the misrepresentations made to induce purchases.  As one example, R.R. would testify about his purchase of a Blackstone product, whether he believed it was a lawfully marketed dietary supplement based on Blackstone's label, the materiality of the defendants' labeling and other representations, and whether he received a response from Blackstone following his report of his adverse event.[5]  The defendants' scheme to defraud the FDA and consumers required the defendants to ignore or cover up serious consumer complaints, and the government's witnesses at trial, especially victims, will provide important probative evidence of the conspiracy to defraud.

---

[5] Notably, assertions that the product was legal or made in an FDA-approved or GMP-compliant facility may also have influenced certain consumers to make assumptions about the health risks associated with a given product.  Such testimony goes to the materiality of the misrepresentations made by the defendants.  See United States v. Kruse, 601 F. App'x. 827, 829 (11th Cir. 2015) (noting that impact of a victim's loss is relevant to a materiality analysis and reliance on misrepresentations).

**C. <u>Victim Testimony Does Not Impermissibly Bolster C.H. or Inflame the Jury</u>**

Evidence that other victims contacted Blackstone does not impermissibly bolster the allegation that C.H. suffered serious bodily injury from an anabolic steroid distributed by the defendants.  To prove this allegation, the government must prove the elements of the conspiracy charged in Count 4, that C.H. consumed a Blackstone product containing anabolic steroids, and that the product caused serious bodily injury—in this case a risk of death.  The government intends to call a handful of victim witnesses, each with an individual experience and interaction with Blackstone products that is distinct from that of C.H.  Although the victims' adverse events were of consequence, they are not inflammatory.  <u>See</u> <u>United States v. Alfaro-Moncada</u>, 607 F.3d 720, 734 (11th Cir. 2010) (no abuse of discretion in admitting relevant images of child pornography even if images "created some risk of injecting emotions into the jury's decision-making").  Rule 403, the Supreme Court has noted, is intended to prevent a jury from "declaring guilt on a ground different from proof specific to the offense charged."  <u>Old Chief v. United States</u>, 519 U.S. 172, 180 (1997).  Here, the victim witnesses' testimony is directly relevant to the mail and wire fraud conspiracy.  The testimony is probative of the allegations in the Indictment and does not introduce any "unfair prejudice" prohibited by the rules.  The defendants' arguments are unpersuasive where they simultaneously argue that these victims' injuries are not so serious as to trigger a statutory reporting requirement, yet are so prejudicial as to improperly influence the jury regarding C.H.'s injuries.  <u>Compare</u> Def. Mot. at 6–7, ¶ 9 <u>with</u> Def. Mot. at 8, ¶ 12.

**D. <u>Evidence that Defendants Ignored Adverse Events Is Not "Other Bad Acts"</u>**

The defendants' actions to ignore or cover up adverse events by victims are not irrelevant "other bad acts."  They are probative examples of the conduct alleged in Count 1.  Importantly, the events at issue are not "other acts" at all, but occurred during the alleged conspiracy, and

directly involve the individual defendants and defendant Blackstone.  They are inextricably linked to the crime for which the defendants will stand trial.

Even assuming, *arguendo*, that these complaints by victims did somehow constitute "other bad acts," the defendants correctly acknowledge that prior or other bad acts may also be admissible to show motive, preparation, knowledge, and intent, as well as an ongoing scheme or plan.  Def. Mot. at 12 (citing United States v. Perez, 443 F.3d 772, 779 (11th Cir. 2006)).  Evidence that is not part of the crime charged but relates to the chain of events explaining the context, motive, and activity of the crime, is properly admitted "if [it is] linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."  United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998).

For example, the fact finder certainly could conclude that Blackstone did not report to FDA an adverse event involving victim S.L. and the Blackstone product Angel Dust because it knew that the product was not being lawfully marketed, and that contacting FDA could result in enforcement actions that would diminish profits or lead to criminal charges.  Overt Act 11 alleges that defendant Singerman was told that a Blackstone product was associated with S.L.'s trip to the emergency room.  The failure of Singerman and the other defendants to address that adverse event either was part of the conspiracy itself or evidence of their knowledge, intent, and the ongoing scheme.  Indeed, the defendants' need to hide such information from FDA was confirmed when Blackstone received a Warning Letter shortly after the incident involving S.L.  FDA warned that failing to cease distributing Angel Dust could result in enforcement action by FDA.  The evidence will show that Blackstone frantically sold out its remaining Angel Dust and then told FDA it would cease distributing the product.  S.L.'s testimony relevant to this episode, as well as Blackstone's

contacts with other victim witnesses, is evidence of the defendants' ongoing conspiracy to defraud consumers and the FDA.

As the Eleventh Circuit has noted, an intent to defraud may be inferred from the defendant's conduct.  See United States v. Davis, 767 F. App'x 714, 724 (11th Cir. 2019).  As such, steps that the defendants took to conceal, downplay, or respond to consumers is directly relevant to the charged offenses of conspiracy to commit mail and wire fraud.  See United States v. Acosta, 660 F. App'x 749, 753 (11th Cir. 2016); United States v. McNair, 605 F.3d 1152, 1203–05 (11th Cir. 2010) ("[E]vidence of similar conduct that occurs during the same time period has 'heightened' probative value.").  Even if the Court determines that ignoring consumers is a separate "bad act" that is not part of the charged scheme or conspiracy, the evidence still would be admissible under Federal Rule of Evidence 404(b).

### E. Defendants' Claim of Late Notice Is Meritless

The defendants also seek to exclude witnesses who are victims because the defendants failed to seek the victims' medical records and now claim there is not sufficient time to do so before trial.  However, the government notified the defense of its potential witnesses, including the victim witnesses at issue, in March 2019.  The defendants describe medical records for victim witnesses as of "obvious importance," yet made no effort to date to secure these records during the intervening years.  The defendants explain that the desire for medical records was "highlighted" in December 2020, when they received additional records regarding victim R.R.  Yet the defendants still took no steps to seek the medical records they now claim they need.[6]

---

[6] The defendants link their supposed lack of notice to the fact that the government did not discuss the victim witnesses at the March 2020 motion hearings.  This assertion makes little sense, as the March 2020 hearings were in response to defense motions to dismiss, motions in limine, and motions to suppress, none of which asserted concerns about victim testimony. In any event, the government had provided a witness list in March 2019 and records of interviews with the victim witnesses in January 2020, both in advance of the March 2020 hearings and well in advance of the motion now filed by defendants.

The defendants' last-minute claim regarding victim medical records is irrelevant – any such records would not prove or disprove what these particular witnesses told Blackstone, or what other victims reported regarding issues with Blackstone products.  The Indictment alleges the defendants "disregarded complaints from consumers who reported getting ill or injured," Indictment at 9, ¶ 7, not that the products provably caused the illness or injury.[7]

### F.  **The Indictment Allegations Challenged by Defendants Are Relevant and Not Surplusage**

The defendants also seek, for the first time since being charged in March 2019, to amend or strike three paragraphs from the indictment.  Each of the paragraphs in question is relevant to the crimes alleged, and thus cannot meet the standard for striking surplusage from an indictment.  Nor are the paragraphs inflammatory or unduly prejudicial as to merit removal.   Each paragraph that defendants dispute is addressed below.

> a.  **PHILLIP BRAUN and AARON SINGERMAN** caused **BLACKSTONE** to evade FDA's regulatory authority and disregard requirements of the FDCA.  Among other things, **BLACKSTONE** disregarded complaints from consumers who reported getting ill or injured from **BLACKSTONE's** products.  **BLACKSTONE** failed to notify the FDA of such complaints, even when required by law.

The defendants seek to strike the sentence, "Among other things, Blackstone disregarded complaints from consumers who reported getting ill or injured from Blackstone's products."  Def. Mot. at 16.  As discussed above, Count 1 alleges a conspiracy to defraud the FDA and consumers via mail and wire fraud.  The defendants wanted to avoid FDA scrutiny, and they knew that they must therefore ignore or discredit consumer complaints.  Overt Act 36, which the defendants also seek to strike, is an example of Blackstone's motive to disregard customer complaints. The allegation that Blackstone disregarded complaints of consumer injuries is directly relevant to the

---

[7] The relevant statute itself focuses simply on notice of events and not causation, providing that "The submission of any adverse event report in compliance with this section shall not be construed as an admission that the dietary supplement involved caused or contributed to the adverse event."  21 U.S.C. § 379aa-1(g).

defendants' scheme to frustrate FDA's regulatory authority to protect consumers from unsafe products.

    b. **Overt Act 11**: On or about March 19, 2015, a **BLACKSTONE** employee forwarded to **AARON SINGERMAN** a customer's email seeking help because **BLACKSTONE's** product Angel Dust caused her stomach pain and vomiting that required emergency medical attention.

    Overt Act 11 refers to victim S.L., who required an emergency room visit and an endoscopy after consuming a Blackstone product.  This overt act demonstrates Blackstone and defendant Aaron Singerman's knowledge of a potentially serious adverse event (a medical or surgical intervention required to prevent inpatient hospitalization) associated with their products,[8] which is evidence of the conspiracy to obstruct the FDA's regulation of Blackstone products alleged in Count 1, manner and means paragraph 7.  Approximately one month after this initial notice, Blackstone received a warning letter from FDA for the same product, Angel Dust (see Overt Act 12), causing Braun and Singerman to direct employees to sell all remaining bottles of the product as quickly as possible.  The Indictment alleges that Blackstone then sent a misleading letter to FDA stating that Blackstone would "immediately cease the distribution and sale of its product, Angel Dust" (see Overt Act 13).

    Overt Act 11 is relevant because it provides context for the defendants' efforts to "fire sale" the Angel Dust product, and is inextricably linked to S.L.'s testimony about her contact with Blackstone.  See <u>McLean</u>, 138 F.3d at 1404 (holding evidence of prior arrest and uncharged involvement in criminal organization was inextricably intertwined).  S.L. is expected to testify that she purchased a product labeled by Blackstone, would not have taken the product if she had known it was not a legally marketed dietary supplement, and that she spoke about the product in person

---

[8] Even if the defendants disagree that this is a serious adverse event, weighing the competing evidence is an issue for trial.

with Phillip Braun and via telephone with Aaron Singerman.  S.L.'s email to Blackstone and her conversations with Braun and Singerman about the emergency medical attention she received after consuming their product helps to explain the defendants' actions.  The conduct in Overt Act 11—the forwarding of S.L.'s email to Singerman—is inextricably linked to the charged conduct and not unduly prejudicial.

      c.  **Overt Act 36**.  On or about January 28, 2017, **PHILLIP BRAUN**, in an email to a **BLACKSTONE** employee who was considering how to respond to a customer complaint, wrote, "I'm not worried about losing the customer. Im [sic] concerned with her making it public."

Overt Act 36 is also relevant to Count 1 of the indictment.  The overt act refers to an email sent by Braun, as president of Blackstone, in which he stated that he was concerned about a customer complaint (and his profane commentary about the customer) becoming public.  Count 1 alleges that the defendants concealed information from consumers about the manufacturing, ingredients, safety, and legality of the products.  Count 1 also alleges that the defendants concealed this information from the FDA.  Braun's desire to hide Blackstone's routine disregard for customer concerns about safety is evidence of the intent to defraud, is intrinsically tied to the charged conduct, and is therefore relevant.  It should not be struck from the indictment.

## CONCLUSION

The expected testimony of the handful of victim witnesses the government intends to call at trial would be relevant, probative, and not unduly prejudicial.  The defendants' complaints about their own failure to seek medical records are a red herring, and there is no reason to keep this evidence from the jury.  Furthermore, the defendants' request to strike language from the indictment also should be denied.  The passages at issue are not surplusage.  None of the language unfairly bolsters anyone's testimony.  The sections defendants cite are relevant to the charged conduct, highly probative of defendants' scheme to defraud consumers through use of the mail and

wires, and not unduly prejudicial.  The defendants' entire motion is without any legal or factual basis, and it should be denied.


Dated:  August 26, 2021

Respectfully submitted,


JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY


GUSTAV W. EYLER
DIRECTOR
CONSUMER PROTECTION BRANCH
U.S. DEPARTMENT OF JUSTICE


  _/s/ Alistair Reader_
ALISTAIR F. A. READER
Court ID A5502377
Trial Attorney
STEPHEN J. GRIPKEY
Court ID A5502620
Trial Attorney
DAVID A. FRANK
Court ID A5500486
Senior Litigation Counsel
JOHN W. BURKE
Court ID A5501294
Assistant Director
U.S. Department of Justice
Consumer Protection Branch
450 Fifth Street, NW Suite 6400
Washington, DC 20001
Alistair.F.Reader@usdoj.gov
(202) 353-9930
Stephen.Gripkey@usdoj.gov
(202) 307-0048
Josh.Burke@usdoj.gov
(202) 353-2001
(202) 514-8742 (facsimile)

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF this August 26, 2021.


_/s/ Alistair Reader_
Alistair Reader
Trial Attorney