UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80030-CR-DIMITROULEAS

UNITED STATES OF AMERICA

vs.

PHILLIP BRAUN,

       **Defendant.**

                                              /

## UNITED STATES' SENTENCING MEMO

The United States, by and through the undersigned counsel, respectfully submits this sentencing memorandum for the Court's consideration in advance of the January 27, 2022 sentencing of defendant Phillip Braun (Braun). For the reasons set forth below, the government recommends that the Court sentence the defendant to the high end of the Sentencing Guidelines range of 63 – 78 months.

Braun was a key leader of the criminal conspiracies executed by Blackstone Labs, LLC (Blackstone Labs), where the defendants earned millions through fraud while callously disregarding health risks to tens of thousands of consumers. Braun's motivation for the criminal activity was clear: making money, regardless of potential effects on consumers. Braun characterized one product as "heroin in a bottle" even as Blackstone Labs continued to sell it to wholesalers. And Braun personally made arrangements to sell anabolic steroids wholesale into late 2016, covering up the illegal sales with "miscellaneous" descriptions in invoices, long after the company itself was telling customers that prohormones were illegal. At the same time, Braun understood the dangers of the products he was providing to consumers, even if they did not.

## I. Factual Background

The government refers the Court to Braun's factual proffer, ECF No. 535, and the presentence investigation report, ECF No. 637, for a detailed summary of the facts.

For more than five years, the defendant organized and led a sophisticated steroid manufacturing and distribution scheme, using outwardly legitimate companies to sell millions of doses of steroids to unwitting consumers under the guise of "safe" and "legal" dietary supplements. The defendant distributed illegal steroids, synthetic stimulants, mind-altering chemicals, and other muscle-building products to all 50 states and to those outside the United States through his fraudulent scheme. Blackstone Labs relied on dozens of supplement retailers, many unwitting, a team of wholesale employees, including co-defendant James Boccuzzi (Boccuzzi), and an email and web marketing campaign to sell products directly to consumers.

As detailed in the factual proffer, Braun, co-defendant Aaron Singerman, and co-defendant Robert DiMaggio (DiMaggio) started Blackstone Labs for the sole purposes of selling unsafe and illegal products. Over time, Braun and his co-defendants avoided scrutiny by deceit and by shifting their sales to new unapproved or unsafe products to sustain their business and income. The defendants schemed to make money the "easy way," combining lies with sophisticated online advertising and a total disregard for their customer's health. At the height of Blackstone conspiracy, Braun collected $50,000-70,000 per month, which he removed from the Blackstone Labs bank account without regard to the business's debts or commitments. Braun and Singerman also used the corporate accounts to purchase extravagant luxury cars, and they maintained a luxurious lifestyle by billing their travel, food, and clothing to Blackstone Labs as business expenses.

Records from the investigation show that from 2014 to 2016, the defendants sold more than $2.9 million in steroid products.[1] These products were routinely sold for $50-60 per bottle to consumers or $25 per bottle wholesale, but even a conservative estimate of $45/bottle means Blackstone Labs sold more than 70,000 bottles of steroids. As each bottle contained 60 capsules, the defendants distributed more than 3.8 million doses of steroids.

More alarmingly, they sold these steroids to unwitting victims who did not know they were steroids and would not have taken them if they had known. One such victim, C.H., testified at co-defendant Boccuzzi's trial, and three other victims will submit statements to the Court explaining the impact on their health, lives and finances.

Braun knew that there were risks to people taking his steroid products. In May 2016, he approved a company script telling customers that the steroid products were illegal and liver toxic. In August 2016, Braun himself emailed a consumer that Blackstone Labs' "Super DMZ Rx 2.0 and Alpha 1-Max are crude and toxic compounds that I would not bother taking," even as he continued to sell the products wholesale.

Nevertheless, and with full understanding of the potential harm this drug could cause to customers, Braun distributed these products throughout the United States. Later, when victims contacted Blackstone Labs directly, Braun and Singerman reviewed their complaints and disregarded their pleas for assistance. When victim C.H.'s wife repeatedly wrote to Blackstone Labs about the injuries to her husband, Braun instructed employee to ignore the "scammer." Nor did they report the harm these drugs caused to customers to the FDA.

---

[1] These calculations do not include sales from 2012 and 2013 as reliable records from Blackstone Labs were unavailable.

## II. Guidelines Calculation

The Probation Office correctly calculated Braun's Sentencing Guidelines for his offenses and his combined adjusted offense level, after accounting for his acceptance of responsibility, is 26, which yields an advisory guidelines range of 63 – 78 months of incarceration. See ECF No. 637, PSR. There are no factual disputes regarding the guidelines, which are consistent with those the parties jointly recommended the Court adopt in the plea agreement and with the facts Braun admitted in his signed factual proffer, which the Court accepted after reviewing it with him at his change of plea hearing. Notably, the defendant would face similar guidelines for either of his two counts of conviction, whether under the Section 2B1.1 fraud guideline or the 2D1.1 controlled substances guideline.

### A. Count 4: Conspiracy to Distribute Controlled Substances

The parties agreed on the following sentencing guidelines: That the base offense level is 20, pursuant to Section 2D1.1(a)(5) and 2D1.1.(c)(10). The base offense will increase by 2, pursuant to Section 2D1.1(b)(7), because controlled substances were distributed through mass-marketing by means of an interactive computer service. The base offense will increase by 2, pursuant to Section 2D1.1(b)(12), because the defendant maintained a building or premises for the purpose of distributing controlled substances. The defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and the offense level will increase by 4 levels pursuant to Section 3B1.1(a). Therefore, the total adjusted offense level would be 28.

### B. Count 3: Introduction of an Unapproved New Drug into Interstate Commerce

The parties agreed on the following sentencing guidelines: That the base offense level is 6, pursuant to Section 2N2.1(c)(1) and 2B1.1(a). The loss is between $1,500,000 and $3,500,000,

pursuant to Section 2B1.1(b)(1)(I) and 1B1.3, increasing the offense level by 16. The offense was committed through mass marketing and the offense level will increase by 2, pursuant to Section 2B1.1(b)(2)(A). The defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and the offense level will increase by 4 levels. Therefore, the total adjusted offense level would be 28. The offenses are grouped together for sentencing purposes, pursuant to Sections 3D1.2(d) and 3D1.3(b).

    C.  <u>Advisory Guideline Range</u>

With a combined offense level of 28 under criminal history category I, and after subtracting two levels for acceptance of responsibility, the defendant's final offense level of 26 is in Zone C, with an advisory range of 63-78 months of imprisonment.

    D.  <u>Fine, Forfeiture</u>

Pursuant to his plea agreement, defendant agreed to a $3,000,000 money judgment forfeiture, and to the forfeiture of any interest in certified funds in the amount of $223,430.40 made payable by JP Morgan Chase Bank to the United States Marshals Service. Under Guidelines § 5E1.2(c)(3), the defendant's fine range is $25,000 to $250,000. Pursuant to 18 U.S.C. § 3571(d), the Court may impose a fine of up to $250,000, or up to twice the gross loss in Count 3. The defendant does not appear to have the ability to pay a significant fine.

    **III.**  **Sentencing Factors and Argument**

Braun's relevant conduct merits a substantial sentence of incarceration at the high end of the Sentencing Guidelines range. Braun was one of the co-founders and leaders of Blackstone and a central figure in the extensive fraud and drug distribution scheme.

A. <u>Respect for the Law</u>

The Court should impose a substantial sentence to promote respect for the law. Although Braun pled guilty on the eve of trial, his years-long pattern of deception and willingness to profit at the expense of consumer safety demonstrated a blatant, persistent disregard for the rule of law. For example, after the federal investigation into Blackstone became overt, Braun told a customer who had reported an adverse event to ignore the law enforcement officer seeking an interview. Braun now apparently intends to return to leadership at Blackstone after incarceration. Thus, the government respectfully urges the Court to impose a significant prison sentence as a necessary way to promote respect for the law, and to deter future criminal conduct by this defendant and others in the dietary supplements industry.

B. <u>Need for Sentence to Reflect Seriousness</u>

The offenses here are serious, as shown by the victim statements, the brazenness of the crimes, the long-term efforts to hide activities from law enforcement, especially the FDA, and the vast quantities of unlawful products. In particular, the volume of drugs distributed vastly exceeds the amounts contemplated by the Sentencing Guidelines. The Guidelines Drug Quantity Table sets forth the volume of steroids doses or capsules, setting the offenses levels at 1,000, 2,500, 5,000, 20,000, 40,000, or 60,000 units or capsules.[2] Braun and his co-defendants sold millions of pills in 60 dose bottles.

The defendant engaged in this drug manufacturing and distribution scheme without any consideration for the adverse personal or societal effects of steroid use and did so for his own financial gain. This puts him in the same category as any other drug dealer — regardless of the type of substance he distributed.

---

[2] One "unit" means one pill, capsule, or tablet. U.S.S.G. § 2D1.1 Note F.

6

### C. Sentencings for Similar Conduct

A lengthy sentence of incarceration is appropriate for the defendant. Defendants who distributed large quantities of anabolic steroids are regularly incarcerated for lengthy terms. However, the government is unaware of cases with similar volume of steroids or comparable conduct – a multi-year scheme selling millions of doses of steroids and numerous illegal products all under the guise of a legitimate business operating online with a conspiracy to impede FDA's regulation of dietary supplements. For example, in United States v. Kestel, No. 1:19-cr-244 (E.D.V.A.), the defendant was sentenced to 60 months' imprisonment for distributing anabolic steroids and money laundering. Kestel engaged in this conduct for three years, and court documents state that he distributed tens of thousands of units of anabolic steroids, with proceeds of at least $370,000. In United States v. Ryan Root, No. 3:15-CR-261 (N.D.N.Y.), the defendant was sentenced to 78 months in prison for steroid distribution and international money laundering convictions. Root purchased distribution-sized amounts of anabolic steroids from China for several years, then arranged for them to be shipped to him and nine co-conspirators to be resold around the country. In United States v. Lambert, No. 2:20-cr-001 (E.D.V.A), the defendant was sentenced to 108 months' imprisonment for conspiracy to distribute and possession with intent to distribute anabolic steroids and for being a felon in possession of a firearm. The government estimated that the defendant distributed at least tens of thousands of steroid units and earned over a million dollars in profits over two and a half years.

Where the defendant led the distribution of millions of doses of steroids in a sophisticated conspiracy selling the unsafe products to unwitting consumers, the Court should impose a sentence at the high end of the guidelines range.

D. Restitution

The Court should order restitution and it should be joint and several with Braun's co-defendants. Restitution is still being calculated in this matter.

E. Deterrence of Criminal Conduct

The dietary supplements industry is enormous. Three years ago, the then-commissioner of the FDA estimated that the industry earns approximately about $40 billion in revenue per year, with at least 50,000 different products available to consumers. See Statement from FDA Commissioner Scott Gottlieb, M.D., on the agency's new efforts to strengthen regulation of dietary supplements by modernizing and reforming FDA's oversight, Feb. 11, 2019, https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-agencys-new-efforts-strengthen-regulation-dietary (last visited Jan. 18, 2022). To deter criminal conduct, it is necessary that there be appropriate punishment for those who risk the public health by intentionally violating the law and FDA's regulation of the dietary supplement industry.

F. Fine and Costs of Incarceration

The defendant should be ordered to pay the mandatory special assessment, and the costs of incarceration (as set forth in the PSR). Moreover, the Court should approve the entry of the money judgment forfeiture described in the plea agreement.

**IV. Conclusion**

Braun oversaw a sophisticated, multi-year conspiracy to defraud and sell dangerous products to thousands of consumers throughout the United States. He knew his acts were wrong and could lead to criminal penalties, but continued with impunity. He is a lead defendant, and his role, history, and characteristics support him receiving a substantial sentence. In light of the factors

set forth in 18 U.S.C. § 3553(a), a sentence at the high end of the Guidelines range is appropriate to reflect the seriousness of the offense, to provide deterrence and protect members of the public, and to promote respect for the law.

Dated: January 26, 2022

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

GUSTAV W. EYLER
DIRECTOR
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

   */s/ Alistair Reader*
ALISTAIR F. A. READER
Court ID A5502377
Trial Attorney
STEPHEN J. GRIPKEY
Court ID A5502620
Trial Attorney
JOHN W. BURKE
Court ID A5501294
Assistant Director
U.S. Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, D.C. 20044-0386
Alistair.F.Reader@usdoj.gov
(202) 353-9930
Stephen.Gripkey@usdoj.gov
(202) 307-0048
Josh.Burke@usdoj.gov
(202) 353-2001

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2022, I electronically filed the foregoing document with the Clerk of the Court, suing the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

    */s/ Alistair Reader*
Alistair Reader
U.S. Department of Justice